*Corey Cunningham, on behalf of Kodi Gaines, a minor v. Baltimore County, Maryland, et al.*, No. 9, September Term, 2023.

**WAIVER – APPELLATE PRESERVATION**

A party that receives an adverse ruling from a trial court must appeal that ruling to properly preserve their claim. Generally, when an aggrieved party fails to appeal a claim, that claim is lost and that party is precluded from pursuing it. However, in specific circumstances, when a trial court enters a ruling disposing of all claims and the Appellate Court reverses in toto, reviving those claims, they are resurrected regardless of whether the claim was properly preserved.

**QUALIFIED IMMUNITY – FOURTEENTH AMENDMENT**

Corporal Ruby is entitled to qualified immunity to Kodi's excessive force claim brought pursuant to the Substantive Due Process Clause of the Fourteenth Amendment. Qualified immunity is proper unless the law "clearly established" that Corporal Ruby violated Kodi's Fourteenth Amendment rights when he ended an armed standoff with Ms. Gaines at her apartment (with Kodi present) by shooting Ms. Gaines. Because the law was not clearly established at the time, qualified immunity is proper.

Circuit Court for Baltimore County
Case No. 03-C-16-009435
Argued: December 4, 2023

IN THE SUPREME COURT

OF MARYLAND

No. 9

September Term, 2023

---

COREY CUNNINGHAM, ON BEHALF OF
KODI GAINES, A MINOR

v.

BALTIMORE COUNTY, MARYLAND, ET AL.

---

Fader, C.J.,
Watts,
* Hotten,
Booth,
Biran,
Gould,
Eaves,

JJ.

---

PER CURIAM
Watts, J., dissents.
Hotten, J., concurs and dissents.

---

Filed: June 25, 2024

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

*Hotten, J., participated in the hearing of the case
and in the conference in regard to its decision as an
active judge. She participated in the adoption of the
opinion as a senior judge, specially assigned.

This appeal comes to us in a challenging posture with a long and tortured procedural history. At the center of the current appeal is petitioner Corey Cunningham's claim on behalf of his minor child, Kodi Gaines,[1] for a violation of Kodi's right to substantive due process under the Fourteenth Amendment to the United States Constitution, brought pursuant to 42 U.S.C. § 1983 (the "Substantive Due Process Claim"[2]). Although central now, the parties and the trial court treated that claim as something ranging between a side issue and a non-issue in the lead-up to trial, during the trial itself, and in post-trial motions practice. As a result, Kodi's Substantive Due Process Claim was not identified to the jury, the jury was not instructed on the standards applicable to that claim, the jury was not specifically asked to reach a verdict on that claim (as distinct from Kodi's claims under the Fourth Amendment to the United States Constitution), and the claim was addressed only briefly and partially in motions for judgment at and following trial. That treatment continued in the first appeal, in which the parties—and, as a result, the Appellate Court of Maryland—treated Kodi's Substantive Due Process Claim as a non-issue. Along the way, the parties' statements and arguments about Kodi's Substantive Due Process Claim have often appeared as ships passing in the night, failing to engage on the same terms and resulting in substantial confusion, even in hindsight.

---

[1] For clarity and ease of reference, we will refer to Mr. Cunningham, acting on behalf of his son Kodi Gaines, as "Kodi," and to his arguments and positions in this case as those of Kodi.

[2] For clarity and ease of reference, we will refer to Kodi's Substantive Due Process Claim in the singular. Although the claim is made in Counts VII and X of the complaint, it is treated as a single excessive force claim.

1

The circuit court rendered the judgment currently on review in favor of the respondents, Baltimore County and Corporal Royce Ruby, the defendants below (the "Defendants"). The court found that the evidence at trial could not sustain a verdict on Kodi's Substantive Due Process Claim. Without ruling on sufficiency, the Appellate Court affirmed on two different, independent grounds: (1) that Kodi had waived his Substantive Due Process Claim by not pursuing that claim during the first round of appellate proceedings; and (2) that qualified immunity barred Kodi's Substantive Due Process Claim. We disagree with the Appellate Court's decision on waiver but agree that under the standard established by the United States Supreme Court, qualified immunity precludes Kodi's Substantive Due Process Claim. Accordingly, we will affirm.

## BACKGROUND

### A.     Legal Framework

We begin by identifying the basic legal framework applicable to excessive force claims as they pertain to innocent bystanders. We do so because the seeming failure of all parties to understand that framework at the trial stage—or if they understood it, the failure to articulate it—is behind much of the confusion that has ensued.

As explained in *Graham v. Connor*, "claim[s] that law enforcement officials used excessive force in the course of making an arrest, investigatory stop, or other 'seizure' of [the] person . . . are properly analyzed under the Fourth Amendment's 'objective reasonableness' standard, rather than under a substantive due process standard." 490 U.S. 386, 388 (1989). Thus, any claim of excessive force by the subject of a seizure—including

2

a seizure by a shooting—is analyzed as a Fourth Amendment claim.[3]  *Id.*  And although the Fourth Amendment originally applied only to the United States government, the protections of that amendment were subsequently incorporated as against the states through the Due Process Clause of the Fourteenth Amendment.  *Mapp v. Ohio*, 367 U.S. 643, 654-56 (1961).

The protections of the Fourth Amendment—either independently or through the Fourteenth Amendment's Due Process Clause—do not, however, extend to bystanders who claim harm from the use of excessive force by a law enforcement officer that was intended for someone else.  That is because a "[v]iolation of the Fourth Amendment requires an intentional acquisition of physical control."  *Brower v. Cnty. of Inyo*, 489 U.S. 593, 596 (1989).  In other words, a Fourth Amendment excessive force claim is available only to a person who an officer intentionally seizes.  *Id.* at 596-97.

However, some courts have recognized that a bystander who lacks the ability to bring a claim under the Fourth Amendment *may* be able to pursue an excessive force claim directly under the substantive component of the Fourteenth Amendment's Due Process Clause.[4]  *See Rucker v. Harford Cnty.*, 946 F.2d 278, 281 (4th Cir. 1991) ("the substantive

---

[3] The Fourth Amendment provides:  "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.

[4] The Due Process Clause contains both procedural and substantive protections.  "Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause

3

protections of the due process clause may" "extend to unintentionally injured bystanders" (internal quotations omitted)). Such claims, if recognized, would not be subject to the "objectively reasonable" test applied to Fourth Amendment excessive force claims, but to the more demanding "shocks the conscience" standard applicable to substantive due process claims. *See Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846-47 (1998) (recognizing the shocks the conscience standard).

The Due Process Clause of the Fourteenth Amendment thus plays a different role in each type of excessive force claim. For claims brought by the object of a seizure under the substantive protections of the Fourth Amendment, the Due Process Clause of the Fourteenth Amendment is the vehicle by which such protections are applied to the states. *Graham*, 490 U.S. at 388, 394-95. Such claims against state actors are still subject to the Fourth Amendment substantive standard, even though they flow through the vehicle of the Fourteenth Amendment. In contrast, with respect to claims brought by innocent bystanders, the Due Process Clause of the Fourteenth Amendment is the source of whatever

---

of the Fifth or Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). "Procedural due process ensures that individuals are not subject to arbitrary governmental deprivation of their liberty and property interests by requiring that litigants 'receive notice, and an opportunity to be heard.'" *Johnson v. Md. Dep't of Health*, 470 Md. 648, 686 (2020) (quoting *Pickett v. Sears, Roebuck & Co.*, 365 Md. 67, 81 (2001)). Substantive due process, by contrast, refers "to the principle that there are certain liberties protected by the due process clauses [of Article 24 and the United States Constitution] from legislative restrictions, regardless of the procedures provided, unless those restrictions are narrowly tailored to satisfy an important government interest." *Id.* (alteration in original) (quoting *Allmond v. Dep't of Health & Mental Hygiene*, 448 Md. 592, 609-10 (2016)).

4

substantive protections may exist under the federal Constitution.[5]  Such claims are pure Fourteenth Amendment claims, subject to the Fourteenth Amendment standard.

Section 1983 of Article 42 of the United States Code is the statutory vehicle that enables plaintiffs to pursue federal constitutional claims against state actors in certain circumstances.[6]  Thus, excessive force claims brought against state officials pursuant to the United States Constitution are brought as § 1983 claims whether brought by the object of a seizure under the Fourth Amendment (through the Fourteenth Amendment) or by a bystander under the Fourteenth Amendment itself.

---

[5] Although Kodi brought claims under both the federal and state constitutions, his current appeal focuses solely on his claims under the United States Constitution.  We presume that is because his Maryland constitutional claims, unlike his federal claims, are subject to the monetary limit on the State's waiver of sovereign immunity under the Maryland Tort Claims Act, *Lee v. Cline*, 384 Md. 245, 266 n.4 (2004), and he is already entitled to recover the maximum available pursuant to that waiver because he prevailed on his battery claim, which is not before us.  As a result, we do not have occasion to consider here either:  (1) the proper standard for a bystander liability excessive force claim under the Maryland Constitution and Declaration of Rights; or (2) whether any form of immunity would apply to such a claim.

[6] 42 U.S.C. § 1983 provides, in relevant part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

## B.    Factual Background[7]

The factual background to this appeal comes from the tragic events of August 16, 2016, when a six-hour standoff between Baltimore County police officers and Korryn Gaines ended with Corporal Royce Ruby shooting and killing Ms. Gaines. Two of the bullets that struck Ms. Gaines subsequently hit and injured Kodi Gaines, Ms. Gaines's son who was then five years old.

On the morning of the shooting, officers attempted to serve arrest warrants on Ms. Gaines and Kareem Courtney at Ms. Gaines's residence in Baltimore County. *Cunningham v. Baltimore Cnty.*, 246 Md. App. 630, 640 (2020) ("*Cunningham I*"). The warrant for Ms. Gaines was for a misdemeanor offense. The officers heard movement inside the apartment, but nobody opened the door when they knocked. *Id.* at 641. After kicking the apartment door open, officers entered the apartment and saw Ms. Gaines seated on the floor with a pistol grip shotgun in her hands. *Id.* The officers left the apartment and called for back-up. *Id.* A hostage negotiation team and a SWAT unit, including Corporal Ruby, were called in, and they took protected positions outside the apartment. A six-hour standoff between Ms. Gaines and the officers ensued. *Id.*

During the standoff, officers were told that Ms. Gaines had a history of mental illness and that she had been off her medication. *Id.* at 646-47. Officers testified that Ms. Gaines acted erratically, sometimes negotiating with officers, at other times threatening them and cutting off contact. *Id.* at 648-49, 690 n.41. Ms. Gaines's boyfriend

---

[7] We set forth the facts in the light most favorable to Kodi. *See Yates v. Terry*, 817 F.3d 877, 884 (4th Cir. 2016).

6

attempted to persuade her to allow Kodi to leave the apartment during the standoff, but Ms. Gaines did not respond, and instead instructed Kodi to stay close to her, which he did.[8]  *Id.* at 646-49.

Through most of the standoff, Ms. Gaines remained in the same location within the apartment, occasionally standing up to stretch her legs while keeping the shotgun pointed at the door.  *Id.* at 650.  Approximately six hours after the standoff began, Ms. Gaines moved to the kitchen, within sight of Corporal Ruby and still in possession of the shotgun.[9]  *Id.*  According to Corporal Ruby, he observed Ms. Gaines raise her shotgun into a firing position and aim toward the hinge side of the front door, from which she could have hit officers stationed on the other side.  *Id.* at 650-52.  Kodi contends that other evidence contradicts that claim.  Among other things, he points out that Corporal Ruby testified that all he could see through his scope were Ms. Gaines's braids and the barrel of the gun, and that other witnesses testified that more of her body would have been visible had she been aiming the gun as Corporal Ruby contended.  *Id.* at 692-93.  Resolving this discrepancy in

---

[8] When the officers arrived, there were at least four people in the apartment: Ms. Gaines, Kodi, Mr. Courtney, and a daughter of Mr. Courtney and Ms. Gaines. *Cunningham I*, 246 Md. App. at 641.  Upon the arrival of the back-up officers, Mr. Courtney left the apartment with the daughter. *Id.*

[9] The record does not disclose why Ms. Gaines went into the kitchen.  At trial, Mr. Cunningham, Kodi's father, testified that Kodi had told a therapist that Ms. Gaines was shot when she went to make him a sandwich in the kitchen. *Cunningham I*, 246 Md. App. at 650.  The record does not otherwise provide support for that or any other specific theory about why Ms. Gaines was in the kitchen.  For purposes of our qualified immunity analysis, we accept Mr. Cunningham's testimony as true.

7

Kodi's favor, although Ms. Gaines may have raised her shotgun, she was not aiming it directly toward officers stationed on the other side of the front door.

Corporal Ruby, who was by that time "hot" and "frustrated[,]" testified that he fired "a head shot," aiming high to avoid hitting Kodi, who he knew was somewhere in the kitchen. *Id.* at 652. The shot passed through the corner of the kitchen drywall, struck Ms. Gaines in her upper back, ricocheted off the refrigerator, and hit Kodi across the cheek. *Id.* at 652-53. At some point between one and 30 seconds later, Ms. Gaines fired her shotgun. *Id.* at 653 n.12. Corporal Ruby led a team of officers into the apartment, when he heard the shotgun go off and being reloaded. *Id.* at 653. When he came into the kitchen and saw Ms. Gaines begin to turn the shotgun toward him, Corporal Ruby fired three more rounds into Ms. Gaines. *Id.* Ms. Gaines died from the gunshot wounds. *Id.* Kodi underwent multiple surgeries to remove bullet fragments from his face, *id.* at 653-54, and required multiple reconstructive surgeries on his elbow, *id.* at 654 n.14.

### C. *Procedural Background*

As our resolution of the first issue in this appeal turns on the procedural background of the case, we discuss that background in some detail.

### 1. *The Complaint*

Although the only dispute remaining in this case concerns Kodi's Substantive Due Process Claim against Corporal Ruby, it originally involved many other parties and claims. In their third amended complaint, plaintiffs Rhanda Dormeus, individually and as personal representative of the estate of Ms. Gaines; Ryan Gaines, Sr., as father of Ms. Gaines; Mr. Courtney, individually and as next of kin to his minor child; and Mr. Cunningham, as

8

father, guardian, and next friend of Kodi (collectively, "Plaintiffs"), filed suit against defendants Baltimore County, Corporal Ruby, and four other officers. Among the twelve counts asserted were wrongful death and a survival action (Counts I and II); claims under Articles 10, 24, 26, and 40 of the Maryland Declaration of Rights based on violations of the Plaintiffs' rights to freedom of speech and press, freedom from unreasonable searches and seizures, freedom from excessive force, and equal protection of the law (Counts III, IV, V, and VI); claims under 42 U.S.C. § 1983 for violations of the First, Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution based on violations of the Plaintiffs' rights to freedom of speech and press, freedom from unreasonable searches and seizures, freedom from excessive force, and equal protection of the law (Counts VII, VIII, IX, and X); and claims for common law battery (Count XI) and negligence (Count XII).

Of particular relevance here are Counts VII and X, both of which alleged § 1983 claims for violating the Plaintiffs' federal civil rights. In Count VII, the Plaintiffs sued the Defendants for violations of the Fourth, Fifth, Eighth, and Fourteenth Amendments due to "force that was clearly excessive to the need, and [that] was objectively and subjectively unreasonable." The count further alleged that the Plaintiffs' rights were violated because the Defendants acted "in a way that was so reckless and/or irresponsible as to be shocking to the consci[ence]." Notably, Count VII referenced the Fourteenth Amendment in two ways, as among the amendments providing "rights, privileges, and immunities" to the Plaintiffs and as the mechanism through which the substantive protections of other amendments are incorporated against the states. In Count X, Ms. Gaines's estate and Kodi

9

sued the Defendants for violating the First, Fourth, and Fourteenth Amendments, including their "right under the Fourth Amendment to be secure in their person from unreasonable seizure through excessive force" and their "right under the Fourteenth Amendment to bodily integrity and to be free from excessive force by law enforcement." The Plaintiffs averred that the Defendants' use of force was "objectively unreasonable," was "malicious and/or involved reckless, callous, and deliberate indifference," and was accomplished "by means of objectively unreasonable, excessive and consci[ence-]shocking physical force[.]"

### 2. *Motion for Summary Judgment*

Before trial, the Defendants filed a motion for summary judgment in which they argued that there was no dispute as to the facts and they were entitled to judgment as a matter of law. Notably, the Defendants argued that under *Graham v. Connor*, 490 U.S. 386 (1989), all excessive force claims must be analyzed under the Fourth Amendment's "reasonableness" standard, rather than the Fourteenth Amendment's substantive due process standard. Applying the Fourth Amendment standard, the Defendants argued that Corporal Ruby's actions were objectively reasonable and that he was entitled to judgment as a matter of law.

Alternatively, the Defendants argued that Corporal Ruby was entitled to qualified immunity on the excessive force claims "because his actions did not violate a clearly established constitutional right." The Defendants also argued that Corporal Ruby was entitled to judgment with respect to Kodi's claims because Fourth Amendment excessive force claims may be made only by the person intended to be seized and so Kodi, who was

10

not the intended object of the shooting, had no claim for excessive force against Corporal Ruby.

In opposing the Defendants' motion, Kodi argued, among other things, that the motion was necessarily only for partial summary judgment, even though it purported to address all of the Plaintiffs' claims, because the "Defendants have set forth no law or relevant facts related to any of Plaintiffs' Fourteenth Amendment Claims." Kodi argued that the Defendants' failure to address his Fourteenth Amendment claims at all meant that the court could not rule on them, and they would necessarily survive summary judgment. Although Kodi did not use the phrase "substantive due process" in his summary judgment filings, these arguments plainly referred to his Substantive Due Process Claim. Kodi further argued that "the use of deadly force against Korryn Gaines and excessive force against Kodi Gaines violated their federal constitutional rights under the Fourth and Fourteenth Amendments," and that the officers were not entitled to qualified immunity.[10]

After a hearing, the circuit court granted in part and denied in part the Defendants' motion. Siding with the Defendants' view of the applicable legal framework, the court determined that Corporal Ruby's actions would be addressed under the Fourth Amendment's objective reasonableness standard and, therefore, the Defendants' failure to separately address the Fourteenth Amendment was not "persuasive." On the merits, as relevant here, the court denied the Defendants' motion as to Counts VII and X. In its ruling,

---

[10] Although Kodi stated in his summary judgment brief that the Fourteenth Amendment's Due Process Clause "includes both procedural and substantive components," he identified only the components of a claim for procedural due process.

11

the court mentioned neither substantive due process nor the Defendants' argument that Kodi lacked a Fourth Amendment claim because he was not the object of a seizure. The case proceeded to trial.

### 3. Motions for Judgment at Trial and Jury Instructions

At the close of the Plaintiffs' case, the Defendants moved for judgment. Addressing the Plaintiffs' excessive force claims as Fourth Amendment claims, the Defendants argued: (1) that Corporal Ruby was entitled to qualified immunity "because he was acting as an officer in his position under the law making a decision which he is allowed to make"; and (2) that Kodi was not the intended object of the seizure and that the Defendants could not be liable to Kodi as a bystander.

In response, Kodi argued that it was up to the jury to decide whether the officers were in danger when Corporal Ruby acted and whether his actions were objectively reasonable. Alternatively, Kodi argued that Corporal Ruby was not entitled to qualified immunity because the officer used excessive force in violation of both the Fourth and Fourteenth Amendments. Kodi contended that he could proceed under both constitutional provisions. He argued that "under the [Fourteenth] Amendment and the [Fourth] Amendment, Kodi can proceed because the law is clear that anyone who is injured by the police if the force was excessive can proceed under the [Fourth] Amendment, and if not, the [Fourteenth] Amendment."

The court denied the motion for judgment as to the § 1983 claims, stating that whether the officers were in danger from Corporal Ruby's perspective was a fact to be left up to the jury.

At the close of all the evidence, the Defendants renewed their motion for judgment. The Defendants continued to argue that the Fourth Amendment's objectively reasonable test applied to Corporal Ruby's actions and that Corporal Ruby was entitled to qualified immunity on any Fourth Amendment excessive force claim. The court again denied the Defendants' motion.

When discussing the § 1983 jury instructions, the circuit court stated that it would include an instruction on the Fourth Amendment. Kodi requested that the court reference both the Fourth and Fourteenth Amendments. When the court refused and articulated its view that the Fourteenth Amendment was just the vehicle by which the Fourth Amendment's protections applied in this case rather than an independent source of protection, Kodi pressed the issue and again asked that the instruction also mention the Fourteenth Amendment. When the court refused again, Kodi asked the court to replace the specific reference to the Fourth Amendment with a generic reference to the "U.S. Constitution." The court ultimately agreed to reference just "the amendments to the United States Constitution," without identifying either the Fourth or the Fourteenth Amendments. Relatedly, Kodi initially argued that the verdict sheet should reference both amendments. When Kodi subsequently requested that the court modify the sheet to remove references to either amendment, the court agreed.

Without referencing any federal constitutional amendment by number, the jury instructions discussed only the Fourth Amendment's objectively reasonable standard for

13

the excessive force claims.[11]   The jury instructions did not identify the "shocks the conscience" standard applicable to Fourteenth Amendment substantive due process claims, nor did any party or the court suggest that they should.

---

[11] As relevant here, the jury instructions on excessive force read:

> The Maryland Declaration of Rights and the Fourth Amendment to the United States Constitution protect persons from being subjected to excessive force.  Every person has the right not to be subjected to excessive or unreasonable force.

> In determining whether the force used was excessive, you should consider:  the need for application of force; the relationship between the need and the amount of force that was used; the extent of the injury inflicted; and whether a reasonable officer on the scene, without the benefit of hindsight, would have used that much force under similar circumstances.  You must decide whether the officer's actions were reasonable in light of the facts and circumstances confronting the officer.  The reasonableness of [the] police officer's actions must be judged objectively from the perspective of a reasonable police officer in the position of the police officer at the time.

> Factors that should be considered in determining reasonableness include what the officer believed at the time of the incident.  The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments in circumstances that are uncertain.  Therefore, in examining Plaintiff's claims, you should look at the situation from the perspective of the police officer on the scene, taking into consideration all the circumstances that you find to have existed at the time as the police officer knew them.  However, you do not have to determine whether the police officer had less intrusive alternatives available, for the police officer Defendant need only to have acted within that range of conduct identified as reasonable.

> As the finders of fact in this case, when considering whether the actions of the police officer were reasonable or unreasonable and excessive, you should consider all of the testimony and evidence in the case, and it is your task to decide the facts of the case where there are competing or disputed renditions of the facts.

14

The jury returned a plaintiffs' verdict on all counts. The first question on the verdict sheet asked whether Corporal Ruby's first shot was "objectively reasonable"—i.e., the Fourth Amendment standard for excessive force—to which the jury answered no.[12] The jury then answered yes to each of a series of questions asking whether the Defendants violated the rights of Ms. Gaines and Kodi under the Maryland Declaration of Rights and 42 U.S.C. § 1983 (without specifying any particular constitutional amendment), and whether they committed a battery against Ms. Gaines and Kodi. The jury awarded Kodi more than $23,000 in past medical expenses and nearly $33 million in non-economic damages. The jury made separate awards of damages to each of the other four plaintiffs, ranging from $307,000 to over $4.5 million. The jury declined to award punitive damages against the Defendants under either the Maryland Declaration of Rights or § 1983. The verdict sheet did not ask the jury whether Corporal Ruby's conduct shocked the conscience of the jurors, nor did any party or the court suggest that it should.

---

The court further instructed the jury that the three elements required to establish a § 1983 claim were: (1) that the acts were committed under color of state law; (2) that the law enforcement officer who committed the acts "intentionally or recklessly deprived the Plaintiff of a federal right"; and (3) "that the Defendant's acts were a proximate cause of injuries sustained by the Plaintiff." With respect to the second element, the court further explained that "[a]n act is intentional if it is done voluntarily and deliberately and not because of mistake, accident, negligence, or other innocent reason," and that "[a]n act is reckless if done in conscious disregard of its known probable consequences."

[12] The verdict sheet instructed the jury to stop and not proceed further if the jurors found that Corporal Ruby's first shot was objectively reasonable.

15

### *4.      Post-Trial Motions*

The Defendants filed post-trial motions, including motions for judgment notwithstanding the verdict ("JNOV"), for a new trial, for remittitur, and for the court to exercise revisory power over the judgment. The Defendants argued, among other things, that Corporal Ruby's first shot was objectively reasonable and, therefore, that he was entitled to judgment as a matter of law on any excessive force claim. Alternatively, the Defendants argued that Corporal Ruby was entitled to qualified immunity because he did not violate clearly established law. In addition, the Defendants argued that there was no violation of Kodi's rights under § 1983 because there can be no Fourth Amendment claim by an innocent bystander who is not the intended object of a seizure and it was "undisputed that Kodi was not the intended target of the shooting[.]"

In his opposition, in addition to defending his verdict under the Fourth Amendment, Kodi contended that he had properly pled and proceeded on his Substantive Due Process Claim, which the Defendants had again ignored. Kodi asserted that he had "consistently maintained that [he] can proceed and was proceeding on his § 1983 claims under the Fourteenth Amendment as an independent basis from the Fourth Amendment at the time of trial." Kodi further argued that under the decision of the United States Court of Appeals for the Fourth Circuit in *Rucker v. Harford County*, 946 F.2d 278, 281 (4th Cir. 1991), an innocent bystander can bring a substantive due process claim under the Fourteenth Amendment if the person was physically injured, regardless of whether the injury was intended. Kodi claimed that his reliance on the Fourteenth Amendment was proper and that the court properly instructed the jury on what Kodi needed to prove to prevail on his

16

§ 1983 claim under both the Fourth and Fourteenth Amendments. He noted that the Defendants had failed to object to the jury instructions regarding the § 1983 claim, and, regardless, caselaw required a finding only that Corporal Ruby had acted recklessly or irresponsibly to support Kodi's Substantive Due Process Claim, which he argued was covered by the jury instructions. Because evidence presented at trial supported a finding that Corporal Ruby's actions were reckless, Kodi argued that the evidence was sufficient to sustain the verdict based on the Fourteenth Amendment.

In argument on the post-trial motions, the Defendants addressed Kodi's contention that he had presented a Fourteenth Amendment claim in addition to a Fourth Amendment claim in three ways. First, the Defendants repeated their prior argument that the exclusive analytical framework applicable to an excessive force claim is the objectively reasonable standard under the Fourth Amendment, not the Fourteenth Amendment "shocks the conscience" standard. Second, the Defendants argued that Kodi did not have a Substantive Due Process Claim regardless "because substantive due process protects against agents of the State acting irrationally and arbitrarily," and there was "no evidence in this case that the actions of Corporal Ruby in any way would amount to being so brutal and inhumane as to shock the conscience of the judicial court." Third, the Defendants contended that Kodi's Substantive Due Process Claim "just do[es]n't appear" in the complaint.

In an opinion that exclusively employed a Fourth Amendment framework to review the Plaintiffs' § 1983 claims, the circuit court granted the Defendants' JNOV motion on

17

the basis that Corporal Ruby was entitled to qualified immunity.[13]  The circuit court did not address either:  (1) Kodi's Substantive Due Process Claim, including the Defendants' contention that it was not supported by the evidence; or (2) the Defendants' contention that Kodi had no Fourth Amendment claim because he was not the intended object of the seizure.  The Plaintiffs appealed.

At this point, it is worth pausing to summarize a few important points as of the time the first appeal was taken.  First, for our purposes here, the operative complaint adequately provided notice that Kodi was proceeding on a substantive due process claim.  Counts VII and X of the complaint plainly identified the Due Process Clause of the Fourteenth Amendment as a substantive basis for the Plaintiffs' claims and alleged that the Defendants' conduct shocked the conscience.  Any complaints about the adequacy of the allegations to support Kodi's Substantive Due Process Claim should have been addressed in motions practice before trial.

Second, although adequately pled, none of the parties focused to any great extent on the Substantive Due Process Claim before the first appeal.  The Defendants consistently took, and the court consistently accepted, the position that Kodi did not have a Substantive Due Process Claim.  Kodi raised the claim several times—including in opposing summary judgment, in opposing the Defendants' motion for judgment at trial, and in opposing the Defendants' JNOV motion—although never in great detail.  Perhaps believing that he had

---

[13] The circuit court also found that if the JNOV ruling were reversed on appeal, a new trial was necessary due to a defective verdict.  In *Cunningham I*, the Appellate Court reversed on that issue.  246 Md. App. 630, 700-02 (2020).

a viable Fourth Amendment claim that was subject to a more permissive legal standard, it seems that Kodi was content to focus primarily on the Fourth Amendment.

Third, as a result, the jury was never presented with the appropriate standard applicable to Kodi's Substantive Due Process Claim—whether the conduct "shocks the conscience," *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846-47 (1998)—and was never asked whether Corporal Ruby's conduct met that standard. Thus, the jury never found that Corporal Ruby violated Kodi's substantive due process rights.

Fourth, although the circuit court never analyzed or ruled expressly on the viability of Kodi's Substantive Due Process Claim, it entered judgment for the Defendants on all counts, including the § 1983 count. That necessarily had the effect of resolving Kodi's Substantive Due Process Claim in favor of the Defendants. This last point will be particularly critical to our waiver analysis.

### 5. Cunningham I

Before the Appellate Court, the Plaintiffs argued, among other things, that the circuit court erred in granting the Defendants' motion for JNOV based on qualified immunity. *Cunningham I*, 246 Md. App. at 679. The Appellate Court affirmed in part, reversed/vacated in part, and remanded for further proceedings. *Id.* at 706. In relevant part, the parties' arguments and the Appellate Court's opinion focused exclusively on the Fourth Amendment standard applicable to excessive force claims.

As relevant here, the Appellate Court held "that the [circuit] court erred in granting the motion for JNOV, with the exception of its ruling dismissing the § 1983 claims against the County." *Id.* The Appellate Court rejected the circuit court's conclusion that Corporal

19

Ruby did not violate clearly established Fourth Amendment law and so was entitled to qualified immunity. *Id.* at 694. Instead, the court held that there were material factual disputes concerning whether Corporal Ruby acted in an objectively reasonable manner in firing the first shot. *Id.* Consequently, the Appellate Court held that the circuit court erred in invalidating the jury's finding that Corporal Ruby did not act reasonably. *Id.* The Appellate Court therefore reversed the grant of JNOV with respect to the claims against Corporal Ruby and remanded for further proceedings. *Id.* at 706.

Two other aspects of the Appellate Court's decision in *Cunningham I* are particularly notable for our purposes. First, the court stated in a footnote that Kodi argued "that the Fourth and Fourteenth Amendment claims regarding Kodi are not properly before this Court because they were not addressed in the circuit court's opinion." *Id.* at 689 n.38. Because no one else raised Kodi's Substantive Due Process Claim, and Kodi expressly told the Appellate Court that the claim was not before it on appeal, that court quite reasonably never addressed or considered that claim.

Second, the Appellate Court pointed out in another footnote that it was confining its entire Fourth Amendment analysis—the only federal constitutional analysis in which it engaged—to the claims related to Ms. Gaines "because . . . Fourth Amendment rights are personal and cannot be vicariously asserted by the family." *Id.* at 690 n.39. Thus, the court observed, the Defendants were correct that Kodi "was an innocent bystander who was not 'seized' within the meaning of the Fourth Amendment" and had no claim under that amendment. *Id.* Other than in those two footnotes and in relaying the procedural

20

background of the case, the Appellate Court's opinion did not address Kodi's § 1983 claims.

### 6. Proceedings on Remand

The Appellate Court remanded the case "to the circuit court for consideration of remaining issues relating to damages. Those issues include, but are not limited to, the damages cap and remittitur." *Id.* at 706. In explaining the scope of its remand, the intermediate appellate court stated that the circuit court could "address the applicability of the damages cap, and if it determines that the verdict remains as it is, an amount that the court found to be excessive, it can address the issue whether a remittitur or new trial is warranted." *Id.* at 704. On remand, the circuit court treated the Appellate Court's use of the phrase "if it determines that the verdict remains as it is" as a recognition that other issues relevant to whether the verdict should remain as it was could still be addressed.

One of those issues turned out to be whether the Defendants had a right to argue that Kodi had no Fourth or Fourteenth Amendment claims under § 1983.[14] The Defendants continued to argue that Kodi lacked a viable Substantive Due Process Claim. They also argued that (1) even if Kodi had such a claim, Corporal Ruby would be entitled to qualified

---

[14] On remand, Kodi initially argued that the Appellate Court's decision, which had focused only on the claims related to Ms. Gaines, had not undermined the validity of his judgment, which he argued should stand under both the Fourth and Fourteenth Amendments notwithstanding the deficiency the Appellate Court had identified in his Fourth Amendment claim. Kodi based that argument on his contention that the Appellate Court had completely reinstated his entire § 1983 claim, which was premised on the Fourth and Fourteenth Amendments, and that the Defendants had waived any argument distinguishing between those amendments. As discussed below, Kodi eventually retreated from that position.

immunity, and (2) any Substantive Due Process Claim would fail because the facts of this case were not "a brutal and inhumane abuse of power shocking the consci[ence]." Among other things, the Defendants argued that Corporal Ruby was entitled to qualified immunity on the Substantive Due Process Claim because the law was not clearly established that he violated Kodi's substantive due process rights. Further, addressing the absence of an objection on their part to the jury instructions for failing to adequately cover a substantive due process claim, they argued that there was never any such claim on which such an instruction was needed.

In response, Kodi eventually acquiesced to the fact that he did not have a Fourth Amendment claim. However, he contended that he pled and argued a Fourteenth Amendment Substantive Due Process Claim. Indeed, Kodi argued that the Appellate Court's ruling had the necessary effect of upholding the jury's verdict on his Substantive Due Process Claim. Kodi reasoned that because the Appellate Court did not disturb the jury's verdict in his favor on his § 1983 claim, while simultaneously observing that he could not rely on the Fourth Amendment, the court must have found that claim supported by the Fourteenth Amendment.

To the extent there was any error in proceeding at trial applying only the Fourth Amendment standard, Kodi argued the error was invited because the Defendants had argued, and the court had accepted over Kodi's objection, that only the Fourth Amendment standard applied to Kodi's claims. Kodi acknowledged that the verdict sheet did not differentiate between the amendments and that the jury instructions referenced only the Fourth Amendment's objective reasonableness standard, but argued that it was the

22

Defendants' obligation to ask for a different instruction if they thought one was required. He claimed the Defendants had waived that issue by not challenging the adequacy of the jury instructions at trial. Finally, Kodi argued that the Defendants had waived a qualified immunity defense with respect to the Substantive Due Process Claim by failing to raise it previously.[15]

After a hearing, the circuit court issued a written opinion again entering judgment for the Defendants.[16] The court explained that, in its initial JNOV ruling, its determination that Corporal Ruby was entitled to qualified immunity obviated the need to decide whether Kodi might otherwise have a claim under either the Fourth Amendment or the Fourteenth Amendment. The circuit court interpreted the Appellate Court's decision in *Cunningham I* as taking qualified immunity entirely off the table,[17] thus requiring it to decide, for the first time, the nature and viability of Kodi's claim.

---

[15] Kodi pointed out that the Defendants had "raised qualified immunity arguments five (5) times previously . . . . However, Defendants never raised a qualified immunity argument against Kodi Gaines' Fourteenth Amendment claim." Kodi acknowledged that this failure was likely attributable to the Defendants' "false impression that Kodi Gaines' 42 U.S.C. § 1983 claim had to be decided under the Fourth Amendment objectively reasonable standard," but argued that it was nonetheless waived. Although Kodi made this waiver argument before the circuit court, he has abandoned it on appeal by not raising it in either the Appellate Court of Maryland or in this Court.

[16] By the time the court ruled on remand, all plaintiffs other than Kodi had settled with the Defendants.

[17] As discussed below, the Appellate Court did not understand its opinion in *Cunningham I* to have resolved any issues concerning Kodi's claims, which it understood had not been adjudicated in the circuit court's original JNOV decision. *See Cunningham I*, 246 Md. App. at 689 n.38. The circuit court, believing its initial JNOV decision had adjudicated Kodi's claims as well as those of Ms. Gaines—at least in part because it treated

23

The court concluded as a matter of law that Kodi did not have a viable § 1983 claim under either amendment. First, consistent with the Appellate Court's decision, and as Kodi had by then conceded, the circuit court held that Kodi had no Fourth Amendment claim because he was not the intended object of the seizure. Second, the court held that Kodi had no Substantive Due Process Claim because (1) his injuries were unintentional, (2) mere negligence cannot support a Fourteenth Amendment claim, and (3) the facts elicited at trial did not meet the shocks the conscience standard. Kodi appealed once more.

### 7. Cunningham II

Before the Appellate Court for a second time, Kodi argued that the circuit court erred in entering judgment for the Defendants on his Substantive Due Process Claim. Among other things, he argued that in concluding that the evidence presented at trial did not meet the Fourteenth Amendment's shocks the conscience standard, the court improperly relied on Corporal Ruby's testimony about the shooting and did not recognize competing evidence that created a dispute of fact that was for the jury to resolve. *Cunningham v. Baltimore Cnty.*, No. 378, Sept. Term, 2022, 2023 WL 2806063, at *12 (Md. App. Ct. April 6, 2023) ("*Cunningham II*").

The Defendants argued that Kodi had waived his Substantive Due Process Claim for two reasons: (1) because he had not raised that claim in *Cunningham I*; and (2) because

those claims as being subject to the same standard and so resolved under the same qualified immunity analysis—treated the Appellate Court's decision as definitively resolving the qualified immunity analysis as to Kodi as well as Ms. Gaines. In our view, although the circuit court's analysis in its original JNOV decision focused exclusively on the claims related to Ms. Gaines, it applied that analysis to Kodi's claims as well, and the judgment the circuit court entered necessarily encompassed Kodi's claims.

24

the jury instructions covered § 1983 claims only under the Fourth Amendment, and there was no jury finding of a violation of Kodi's Fourteenth Amendment rights. *Id.* The Defendants further argued that even if the substantive due process arguments were not waived: (1) the circuit court correctly determined that the evidence presented at trial did not meet the shocks the conscience standard as a matter of law; and (2) Corporal Ruby would have qualified immunity against any claim for excessive force. *Id.*

With respect to the Defendants' reliance on the jury instructions, the Appellate Court agreed with the Defendants that the instruction on excessive force discussed only the Fourth Amendment's reasonableness standard and did not cover the Fourteenth Amendment's shocks the conscience standard. *Id.* at *12-15. But the Appellate Court agreed with Kodi that the Defendants had waived their right to argue that the jury was improperly instructed by not objecting to the instructions at trial. *Id.* at *16.

The Appellate Court agreed with the Defendants, however, that Kodi had waived his Substantive Due Process Claim. *Id.* at *16. As a preliminary matter, the Appellate Court observed that the issue presented in *Cunningham I* was "whether Corporal Ruby was entitled to qualified immunity with respect to a violation of Ms. Gaines' and Kodi's Fourth Amendment rights."[18] *Id.* at *11. The Appellate Court explained that the circuit court had

---

[18] In footnote 38 of *Cunningham I*, the Appellate Court stated that Kodi had argued that neither his Fourth nor Fourteenth Amendment claims were properly before that court "because they were not addressed in the circuit court's opinion." 246 Md. App. at 689 n.38. That may have been a reference to Kodi's reply brief in *Cunningham I*, in which he took the position that neither the Defendants nor the circuit court had acknowledged the distinction between his Fourth and Fourteenth Amendment claims at any point and, therefore, any "discussion . . . concerning the distinction between the Fourth and Fourteenth

treated all of the § 1983 claims as excessive force claims under the Fourth Amendment and that all parties had presented the claims that way on appeal, with Kodi expressly stating that his Substantive Due Process Claim was not part of that appeal. *Id.* Therefore, according to the Appellate Court, the limited issue in *Cunningham I* was whether the circuit court erred in finding that Corporal Ruby was entitled to qualified immunity on the Fourth Amendment claims. *Id.* at *11-12.

The problem for Kodi, according to the Appellate Court, was that although the circuit court's JNOV ruling was based exclusively on a Fourth Amendment analysis, the court entered judgment for the Defendants with respect to the entirety of Kodi's § 1983 claims. *Id.* at *17. The result of the JNOV ruling was therefore to dismiss *all* claims against the Defendants, including the Substantive Due Process Claim. *Id.* As a result, to preserve that claim, it was incumbent on Kodi to challenge the circuit court's entry of judgment on it during the first appeal. *Id.* at *17-18. By failing to do so, Kodi waived the claim and was not entitled to "a second bite at the apple to raise [the Substantive Due Process C]laim in the present appeal." *Id.* at *18.

Amendment claims of Kodi Gaines . . . is not before th[e Appellate] Court." Although Kodi argued there that the *distinction* between his Fourth and Fourteenth Amendment claims was not properly before the Appellate Court, we have not found anywhere in which he took the position that his Fourth Amendment claim itself was not before the Appellate Court in *Cunningham I*.

Regardless, before the Appellate Court in *Cunningham II*, Kodi took the position that although his Fourth Amendment claim had been before that court in *Cunningham I*, his Substantive Due Process Claim had not been. The Appellate Court agreed. *See Cunningham II*, 2023 WL 2806063, at *11.

The Appellate Court held, in the alternative, that even if Kodi had not waived his Substantive Due Process Claim, Corporal Ruby would be entitled to qualified immunity on that claim because Kodi had not shown that, at the time of the shooting, "there was clearly established law that Corporal Ruby's conduct violated Kodi's substantive due process right as a bystander."[19]  *Id.* at \*19.  The Appellate Court found no precedent from

---

[19] The Appellate Court observed in its opinion that Kodi, "even now, . . . is not vigorously pursuing a substantive due process claim on the merits." *Cunningham II*, 2023 WL 2806063, at \*18.  As proof of that, the Appellate Court discussed Kodi's lack of engagement with the Defendants' argument for qualified immunity. *Id.*  The Appellate Court noted particularly that when qualified immunity was raised at oral argument in that court, Kodi's counsel "stated 'that ship has sailed,' arguing that this Court addressed this issue in *Cunningham I*." *Id.*  To the contrary, the Appellate Court stated, it had not addressed the Substantive Due Process Claim at all in *Cunningham I*, including with respect to qualified immunity. *Id.*

In light of the different understandings of the parties, the circuit court, and the Appellate Court concerning what was resolved in *Cunningham I* and what was before the circuit court on remand after that decision, we interpret Kodi's appellate arguments on this issue differently.  As we previously discussed, the circuit court believed that its initial ruling on qualified immunity addressed the entirety of Kodi's § 1983 claim, without regard to the particular constitutional provision(s) underlying that claim, and that the Appellate Court's opinion in *Cunningham I* had rejected qualified immunity as to the entirety of Kodi's § 1983 claim.  As a result, the circuit court's ruling on remand did not address qualified immunity at all.  That ruling did, however, address Kodi's Substantive Due Process Claim, ruling that the evidence at trial was insufficient to support that claim.  In his appellate briefing in *Cunningham II*, Kodi addressed the circuit court's ruling on the sufficiency of the evidence for his Substantive Due Process Claim on the merits, arguing at some length that the court erred in focusing only on certain evidence and ignoring other evidence that, according to Kodi, supported his claim.  The Defendants also focused their appellate briefing primarily on the circuit court's ruling on the merits, although they did argue in the alternative that the Appellate Court should find that Corporal Ruby was entitled to qualified immunity.  It was in that context that Kodi answered that the "ship ha[d] sailed" on the Defendants' qualified immunity claim. *Cunningham II*, 2023 WL 2806063, at \*18.

any relevant court "establishing that a police officer, who unintentionally shoots and injures an innocent bystander under circumstances similar to this case violates the bystander's Fourteenth Amendment substantive due process rights." *Id.* Accordingly, the Appellate Court determined that even if Kodi had not waived his Substantive Due Process Claim, the court would have rejected that claim based on qualified immunity. *Id.*

## DISCUSSION

### I. WAIVER

Although we agree with most of the Appellate Court's waiver analysis, we disagree with the final step of that analysis and its outcome. First, we agree with the Appellate Court that even though the circuit court's ruling on the JNOV motion did not mention Kodi's Substantive Due Process Claim, or provide any reason for rejecting it, the necessary effect of the circuit court's entry of judgment for the Defendants on Kodi's § 1983 claims was to enter judgment on the entirety of those counts, including his Substantive Due Process Claim.

Second, we agree with the Appellate Court that if Kodi wanted to preserve his Substantive Due Process Claim, it was incumbent upon him to challenge the circuit court's entry of judgment encompassing that claim as part of the first appeal. *See Offutt v. Montgomery Cnty. Bd. of Ed.*, 285 Md. 557, 564 n.4 (1979) (explaining that a party

---

As it turns out, of course, the Appellate Court believed that qualified immunity on the Fourteenth Amendment claim was still a live issue that had not been resolved by its opinion in *Cunningham I*. In sum, although we agree that Kodi failed to engage on the issue of qualified immunity before the Appellate Court, based on his position that the issue had already been definitively resolved in his favor, we do not agree that he failed to engage in arguments about the merits of his Substantive Due Process Claim.

28

aggrieved by the trial court's judgment may take an appeal). Had the Appellate Court affirmed the circuit court in *Cunningham I*, with or without any discussion of the Substantive Due Process Claim, it is beyond question that the affirmance would have applied to the entire § 1983 claim. And had the Appellate Court reversed the circuit court in *Cunningham I* only with respect to Kodi's claim against Corporal Ruby under the Fourth Amendment, it is similarly beyond question that Kodi would not have been able to resurrect his Substantive Due Process Claim.

Third, we agree with the Appellate Court that Kodi's failure to argue that the circuit court erred in entering judgment against him on his Substantive Due Process Claim in briefing in the first appeal waived his right to have the Appellate Court address that claim and precludes him from arguing in any subsequent appeal that the court's original JNOV ruling on that claim was incorrect. *See Fidelity-Baltimore Nat'l Bank & Tr. Co. v. John Hancock Mut. Life Ins. Co.*, 217 Md. 367, 371-72 (1958) (stating that it "is the well-established law of this state that litigants cannot try their cases piecemeal. . . . [T]hey cannot, on the subsequent appeal of the same case raise any question that could have been presented in the previous appeal on the then state of the record, as it existed in the court of original jurisdiction."). Had the Appellate Court's judgment in *Cunningham I* failed to revive the Substantive Due Process Claim or failed to reject the reasoning on which the circuit court had resolved that claim against Kodi in the original JNOV ruling, Kodi would have had no right to object and no legitimate contention that the claim survived.

Nevertheless, we do not find Kodi's current claims to be precluded by waiver for two reasons. First, the Appellate Court's judgment in *Cunningham I* revived Kodi's

Substantive Due Process Claim. The Appellate Court's decision, much like the circuit court's decision before it, did not discuss the Substantive Due Process Claim in any way. Nonetheless, in "revers[ing] the grant of JNOV with respect to the claims against Corporal Ruby," without identifying any carveout, the Appellate Court necessarily included the Substantive Due Process Claim in its judgment. *Cunningham I*, 246 Md. at 706. The Appellate Court's opinion in *Cunningham I*, by its plain terms, revived *all* of the claims against Corporal Ruby that had been rejected by the circuit court's grant of the JNOV motion. Thus, in the same way and to the same extent that the circuit court's grant of the JNOV motion necessarily rejected Kodi's Substantive Due Process Claim, the Appellate Court's blanket reversal of the grant of that JNOV motion (with respect to the claims against Corporal Ruby) necessarily revived Kodi's Substantive Due Process Claim. Kodi did not have a right to have the Appellate Court revive his Substantive Due Process Claim, but the court did so anyway.[20]

---

[20] As we have discussed, Kodi adequately pled his Substantive Due Process Claim in the complaint, and although that claim was not a primary focus of his arguments until remand, he never abandoned it. However, Kodi failed to request that the jury be instructed on the law applicable to his Substantive Due Process Claim. As a result, when the jury was asked to rule on whether the Defendants violated Kodi's rights under 42 U.S.C. § 1983, the jury was never informed of the standard required to make such a finding with respect to a substantive due process claim. Before the Appellate Court in *Cunningham II*, one of the grounds on which the Defendants challenged the verdict was the failure of the circuit court to instruct the jury on the standard applicable to Kodi's Substantive Due Process Claim. But the Appellate Court ruled against the Defendants on that issue, and the Defendants have abandoned it before this Court. As a result, we do not have occasion here to determine the effect of Kodi's failure to ask the circuit court to instruct the jury on the standard for the Substantive Due Process Claim and the resulting lack of a jury determination that Kodi satisfied that standard.

Second, the argument Kodi failed to make in the first appeal, and so forever waived the right to make in subsequent appeals, is not the same argument he is pursuing here. In the first appeal, the circuit court had entered judgment on Kodi's Substantive Due Process Claim based on a Fourth Amendment-centered qualified immunity analysis, without testing the evidentiary sufficiency of that claim. Kodi lost the right to challenge that qualified immunity decision by failing to argue against it. Then, on remand, the circuit court ruled, for the first time, on whether the evidence was sufficient to support the verdict, finding that it was not. Because the circuit court did not rule on the sufficiency of the evidence to support Kodi's Substantive Due Process Claim until its decision on remand from *Cunningham I*, Kodi was not barred from challenging that decision before the Appellate Court in *Cunningham II*. Accordingly, based on the unique and convoluted procedural history of this case, the Appellate Court erred in *Cunningham II* in holding that Kodi was precluded from pursuing his Substantive Due Process Claim on remand and in this appeal.

## II. QUALIFIED IMMUNITY

The alternative ground on which the Appellate Court affirmed the circuit court on remand was that Corporal Ruby was entitled to qualified immunity on Kodi's Substantive Due Process Claim. *Cunningham II*, 2023 WL 2806063, at *19. We agree with the Appellate Court that under the governing standard provided by the United States Supreme Court, Corporal Ruby is entitled to qualified immunity on Kodi's Substantive Due Process

31

Claim.[21]  The facts of the accidental shooting of Kodi are tragic and heartbreaking. However, at the time of the shooting, no decision from any appellate court in the country— much less a controlling decision or "a robust consensus of persuasive authority," *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018)—had held that an officer who took action similar to that of Corporal Ruby violated the Fourteenth Amendment.  Accordingly, we cannot conclude that the law at the time "clearly established" that Corporal Ruby violated Kodi's Fourteenth Amendment rights when he ended an armed standoff with Ms. Gaines at her apartment by shooting Ms. Gaines with Kodi present.

A full qualified immunity analysis would normally proceed in two steps.  First, we would assess Kodi's underlying argument that the shooting violated his substantive right to due process under the Fourteenth Amendment, taking the evidence at trial in the light

---

[21] Our dissenting colleagues contend that the Defendants waived and/or failed to preserve for appellate review their argument that Corporal Ruby is entitled to qualified immunity with respect to Kodi's Substantive Due Process Claim.  *See* Dissenting Op. of Watts, J. at 4-8; Dissenting Op. of Hotten, J. at 2-3 n.2.  However, Kodi himself has waived any argument that the Defendants waived or failed to preserve their argument concerning qualified immunity.  As noted above, *see* footnote 15 *supra*, on remand in the circuit court Kodi argued that the Defendants had waived a challenge to the Substantive Due Process Claim based on qualified immunity.  However, in the Appellate Court of Maryland in *Cunningham II*, Kodi abandoned that claim of waiver.  Nor did Kodi raise any issue concerning waiver or preservation in his petition for *certiorari* or make any such arguments in his briefing or in oral argument to this Court.  We conclude that Kodi made the strategic decision not to raise any threshold claim of waiver or lack of preservation on the part of the Defendants in this Court.  In these circumstances, we decline to consider on our own initiative whether the Defendants waived or failed to preserve for appellate review their argument that Corporal Ruby is entitled to qualified immunity on Kodi's Substantive Due Process Claim.  *See, e.g.*, *Madrid v. State*, 474 Md. 273, 322 (2021) (declining State's invitation to consider non-preservation issues because the State did not file a cross-petition for certiorari and did not raise the issues in the Appellate Court); *State v. Williams*, 392 Md. 194, 227 n.11 (2006) ("By not himself contesting the issue and its waiver ... in a cross-petition, the respondent has not preserved the issue of waiver[.]").

most favorable to him.  *Yates v. Terry*, 817 F.3d 877, 884 (4th Cir. 2016).  Second, if we determined that there was a violation, we would then assess whether qualified immunity was nevertheless warranted because it was not "clearly established" at the time that the shot violated Kodi's rights.  *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009).  The two steps need not be taken in order, although doing so is "sometimes beneficial[.]"  *Camreta v. Greene*, 563 U.S. 692, 707 (2011).  Rather, courts have discretion to invert the order and to address only one step or the other, depending on the circumstances.  *Pearson*, 555 U.S. at 236.  There are also times when it can be better to proceed out of order, such as when "it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right."  *Rivera-Corraliza v. Morales*, 794 F.3d 208, 215 (1st Cir. 2015) (providing examples).  Here, we will only undertake the second step of the analysis.  We hold that it was not clearly established that Corporal Ruby would violate Kodi's right to substantive due process under the Fourteenth Amendment when Corporal Ruby shot Ms. Gaines.  Accordingly, Corporal Ruby is entitled to qualified immunity.[22]

Qualified immunity protects officers who operate in "the sometimes hazy border between excessive and acceptable force"—shielding officers from suit in this gray area,

---

[22] Admittedly, it is sometimes difficult to separate the two-step process. For instance, it "may be difficult to decide whether a right is clearly established without deciding precisely what the existing constitutional right happens to be." *Lyons v. City of Xenia*, 417 F.3d 565, 581 (6th Cir. 2005) (Sutton, J., concurring). Additionally, "[i]n some cases, a discussion of why the relevant facts do not violate clearly established law may make it apparent that in fact the relevant facts do not make out a constitutional violation at all." *Pearson*, 555 U.S. at 236. To be clear, however, we do not attempt to analyze the first part of the test for qualified immunity here.

even when their use of force is later held to violate a constitutional protection. *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (cleaned up). Thus, officers are entitled to qualified immunity unless the unlawfulness of their conduct as to a particular constitutional right was "clearly established" at the time. *Wesby*, 583 U.S. at 63. To satisfy this standard, the law must have been "sufficiently clear" such that "every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (cleaned up). This is a high bar, and it typically requires either controlling authority or "a robust consensus . . . of persuasive authority" that gives officers sufficiently specific notice that their conduct violated a particular right. *Wesby*, 583 U.S. at 63 (internal quotations omitted). Accordingly, the Supreme Court concluded that officers were entitled to qualified immunity where there was only a "hazy legal backdrop[,]" *Mullenix v. Luna*, 577 U.S. 7, 14 (2015), as well as where there was no specific precedent finding a violation under similar circumstances and a violation was not otherwise "obvious." *Wesby*, 583 U.S. at 65.

"Clearly established" does not mean that there must be a case with precisely matching facts or that found a violation in the same specific context. *Yates v. Terry*, 817 F.3d 877, 887 (4th Cir. 2016); *see also Williams v. Strickland*, 917 F.3d 763, 770 (4th Cir. 2019) ("In some cases, government officials can be expected to know that if X is illegal, then Y is also illegal, despite factual differences between the two."). Nevertheless, the robust consensus of authority at least must have "placed the . . . constitutional question beyond debate" in the circumstances confronted by the officer. *Kisela v. Hughes*, 584 U.S. 100, 104 (2018). Mere general guidance in the law is not enough because it does not help

officials answer the "crucial question" of whether they "acted reasonably in the particular circumstances[.]" *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014). Indeed, specificity in the law is "especially important" in circumstances where police officers—as opposed to other officials—must confront and apply "relevant legal doctrine" in the field. *See Mullenix*, 577 U.S. at 12 (explaining, in the Fourth Amendment context, the particular importance of specificity because "it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation").

Under these principles, to determine whether Corporal Ruby's conduct was "clearly established" as unlawful under the Fourteenth Amendment, it is also necessary to consider the requirements of that constitutional standard. As previously explained, bystanders like Kodi, who are not the intended targets of police action, are not protected by the Fourth Amendment and its "objective reasonableness" standard when they are harmed by allegedly excessive police force. *See Brower v. Cnty. of Inyo*, 489 U.S. 593, 596-97 (1989); *Rucker v. Harford Cnty.*, 946 F.2d 278, 281 (4th Cir. 1991). Instead, their constitutional protection stems from the due process protections of the Fourteenth Amendment—a different source with a higher threshold. *See Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998). In a constitutional sense, these protections are only "residual[.]" *Rucker*, 946 F.2d at 281. That is, these safeguards serve as a safety net, affording protection only where no other constitutional amendment supplies the analysis. *See Lewis*, 523 U.S. at 842-43. The Supreme Court has "always been reluctant to expand the concept of substantive due process," resulting in these residual protections redressing "only the most egregious official conduct[.]" *Id.* at 842, 846 (internal quotation marks and citations omitted).

35

Police action that injures a bystander will not violate substantive due process rights under the Fourteenth Amendment unless it "amount[s] to a brutal and inhumane abuse of official power literally shocking to the conscience." *Rucker*, 946 F.2d at 281 (internal quotation marks and citation omitted). Conduct that is merely "disturbing and lacking in judgment" will fall short, *Temkin v. Frederick Cnty. Comm'rs*, 945 F.2d 716, 723 (4th Cir. 1991), as will conduct that is merely negligent, *Rucker*, 946 F.2d at 282. Indeed, although it is "possible" that sufficiently "reckless and irresponsible" actions like "shooting into a crowd at close range" could rise to the level of a Fourteenth Amendment violation, *see Rucker*, 946 F.2d at 282 (speculating about the possibility in dicta), the parties have cited no case decided by the time of the shooting here that had reached such a conclusion.

Thus, put in the correct Fourteenth Amendment terms, the relevant inquiry here is whether it was clearly established that Corporal Ruby's decision to shoot at Ms. Gaines was a brutal and inhumane abuse of official power *with respect to Kodi* that shocks the conscience. *See Mullenix*, 577 U.S. at 13; *Rucker*, 946 F.2d at 281. The difficulty of that standard—and the differences between it and Fourth Amendment "objective reasonableness" cases—forecasts the qualified immunity result here. The relevant cases generally fall into a few different categories, none of which would put an officer in Corporal Ruby's position on notice that their conduct would violate Kodi's Fourteenth Amendment rights.[23]

---

[23] There are also cases that do not fall neatly into distinct categories, but that nevertheless emphasize the difficulty of making out a violation of substantive due process. For instance, in one extreme example, an officer did not violate a bystander's Fourteenth

*First*, several cases involved traffic accidents and high-speed police chases, often determining that officers did not violate bystanders' Fourteenth Amendment rights. *See, e.g.*, *Lewis*, 523 U.S. at 855 (no violation when officer in pursuit of a motorcycle drove approximately 100 miles per hour in a residential neighborhood and accidentally crashed into the passenger on the motorcycle); *Temkin*, 945 F.2d at 718, 723 (no violation when officer in pursuit drove approximately 60 miles per hour down a narrow road and crashed into a bystander's car); *Rucker*, 946 F.2d at 281-82 (no violation where officers in pursuit fired upon the tires of a vehicle driven by a fleeing suspect and accidentally shot a bystander when, among other things, officers did not know the bystander was in the line of fire). Because the circumstances in these cases were so different from the situation facing Corporal Ruby, these cases would have provided little practical guidance to Corporal Ruby about whether his shot would violate Kodi's rights. Simply put, it would be difficult for officers in Corporal Ruby's position to glean any guiding standards from these cases, except possibly in the most general sense. High-speed pursuits present different considerations from armed standoffs and hostage situations, and, moreover, these cases found no Fourteenth Amendment violations. Indeed, the facts of one case did not even "approach" such a violation. *Rucker*, 946 F.2d at 281. Thus, these cases would not put

---

Amendment rights when he instructed the bystander to assist with a suspect who was struggling with the officer over the officer's firearm—even when the officer subsequently fled into the bushes, leaving the bystander behind to be shot by the suspect. This was the case because the officer did not "inten[d] to harm" the bystander. *Radecki v. Barela*, 146 F.3d 1227, 1228, 1232 (10th Cir. 1998).

Corporal Ruby on sufficient notice that shooting at Ms. Gaines would violate Kodi's substantive due process rights.

*Second*, several cases involved shootouts with suspects. These cases are a somewhat better fit for Corporal Ruby's situation, because officers involved in shootouts have little or "no opportunity to ponder or debate their reaction" to armed suspects. *See Claybrook v. Birchwell*, 199 F.3d 350, 359-60 (6th Cir. 2000) (noting that such situations can be "rapidly evolving, fluid, and dangerous predicament[s] [that] preclude[] the luxury of calm and reflective pre-response deliberation"). In this context, courts have concluded that police generally do not violate substantive due process protections when they fire their weapons without "malice or sadism" toward bystanders—even when bystanders are accidentally shot. *Id.* at 361. Indeed, some courts have concluded that bystanders' Fourteenth Amendment rights are not violated in this context unless officers acted either with "intent to harm" the *bystander*, or if officers (1) had a moment of reflection, (2) knew a bystander was in "the line of fire[,]" and (3) consciously disregarded the risk that the bystander would be shot. *See Simpson v. City of Fort Smith*, 389 Fed. Appx. 568, 570 (8th Cir. 2010) (holding that a bystander's Fourteenth Amendment rights were not violated, but reasoning that there could be situations where that would not be the case).[24]

---

[24] Likewise, dicta from another case supports this same analysis. The Fourth Circuit has speculated that firing into a crowd could "possibly" violate an innocent bystander's Fourteenth Amendment rights if the bystander is shot. *See Rucker*, 946 F.2d at 282. This is because when officers fire into a crowd in hopes of shooting a suspect, innocent bystanders are necessarily also in the line of fire. Of course, an acknowledgment in one case of a possibility in dicta generally does not render a proposition "clearly established."

This group of cases also would not have put Corporal Ruby on sufficient notice that his conduct would violate Kodi's substantive due process rights. These cases generally found no Fourteenth Amendment violations, and they further noted that police did not know bystanders were present or in the line of fire. *E.g.*, *Claybrook*, 199 F.3d at 360-61; *Simpson*, 389 Fed. Appx. at 570-71. Even though unawareness of a bystander's presence can preclude a constitutional violation, it does not necessarily follow that awareness of a bystander's presence can create a violation. Thus, at the very least, these cases do not "clearly establish" that Corporal Ruby's knowledge of Kodi's presence in the kitchen, somewhere outside the direct line of fire to Ms. Gaines, at the time he fired his shot meant that he violated Kodi's due process rights.

*Third*, several cases involve police faced with armed assailants and hostages. In this context, sometimes, "the hostage is hit by a bullet intended for the hostage-taker[.]" *Medeiros v. O'Connell*, 150 F.3d 164, 169 (2d Cir. 1998). Such was the case in *Medeiros*, where officers fired upon a hostage-taker in a van who had been shooting at officers, and accidentally shot the hostage (who was also in the line of fire) in the process. *Id.* at 166-67. The court held that the officers did not violate the hostage's Fourteenth Amendment rights, reasoning that the officers' attempt to rescue the hostage was "admirable" and so did not shock the conscience as a matter of law—even though the hostage could have been in the line of fire and officers knew it. *Id.* at 170. In these situations, courts have generally held that officers do *not* violate hostages' Fourteenth Amendment rights when they fire upon the hostages' captors and accidentally hit the hostages, so long as they did not intend to harm the hostages or have actual knowledge that the hostages would be harmed. *See*

39

*Landol-Rivera v. Cruz Cosme*, 906 F.2d 791, 797 (1st Cir. 1990) ("To hold that shooting in such circumstances violates the constitutional rights of a hostage whom the officers are trying to free would be to hamstring seriously law enforcement officers. . . . It is inevitable that the police response to violent crime will at times create some risk of injury to others, including innocent bystanders. We decline to hold that the mere presence of risk reflects a callous indifference to the constitutional rights of those individuals[.]"); *see also Childress v. City of Arapaho*, 210 F.3d 1154, 1158 (10th Cir. 2000) (officers did not violate hostages' Fourteenth Amendment rights as a matter of law when they fired 21 shots at their captors' van and hit the hostages, regardless whether the officers were "grossly negligent, reckless and even deliberately indifferent to [the hostages'] plight[,]" because the hostages did not allege that the officers "harbored an intent to harm them"). These cases suggest that it is generally difficult to make out a Fourteenth Amendment substantive due process claim in hostage situations because of the limited protection afforded by substantive due process.

Here, there is no evidence that Corporal Ruby intended to harm Kodi or that he knew that Kodi would be harmed, and indeed he aimed high to avoid hitting Kodi. It was only after Corporal Ruby's bullet hit and passed through Ms. Gaines's upper back, hit a refrigerator, and ricocheted that Kodi was harmed. In other words, it is undisputed that, in fact, Kodi was not in the direct line of fire of the shot that Corporal Ruby took.[25] There

---

[25] Justice Watts states that, taking the evidence in the light most favorable to Kodi, leads "to the conclusion that Corporal Ruby saw neither Ms. Gaines's braids nor the barrel of her gun." Dissenting Op. of Watts, J. at 14. The import of Justice Watts's reading of

40

appears to be no case at the time of the shooting that held an officer liable under the Fourteenth Amendment for a ricochet shot, and several cases in the hostage context that did not hold officers liable in an even more serious context: accidentally shooting a hostage when the officer had reason to believe that the hostage was in the line of fire.

Ms. Gaines was Kodi's mother and undoubtedly loved him dearly. Still, it is undisputed that Ms. Gaines, armed with a shotgun, declined an opportunity to let Kodi exit the standoff. In addition, the officers were told that Ms. Gaines had a history of mental illness and that she had been off her medication. At the time this shooting occurred, there was no controlling authority or robust consensus of authority putting Corporal Ruby on notice that, under these circumstances, it would violate Kodi's substantive due process rights to end the six-hour standoff by shooting at Ms. Gaines's upper body. Qualified immunity attaches unless the law and the circumstances clearly show that the question of a constitutional violation is "beyond debate." *White v. Pauly*, 580 U.S. 73, 79 (2017) (internal quotation marks and citation omitted). Because the law at the time of the shooting left the matter at least debatable, we hold that Corporal Ruby is entitled to qualified immunity on Kodi's Substantive Due Process Claim.[26]

the record is that Corporal Ruby did not know Ms. Gaines's location in the kitchen at the time he fired, and that he randomly fired toward the kitchen with no reason to believe that his shot would hit Ms. Gaines. In our view, it is not reasonable to conclude that the jury found Corporal Ruby fired randomly into the kitchen. Corporal Ruby's shot, in fact, hit Ms. Gaines. Moreover, had the jury believed that Corporal Ruby was aiming blindly when he fired, it is difficult to imagine that the jury would not have awarded punitive damages.

[26] *Amici* assert that "[t]he 'clearly established law' standard has proven unworkable, with the question of whether conduct has violated 'clearly established' law presenting 'a

In reaching this conclusion, it is worth reiterating that the jury never determined that Corporal Ruby's conduct toward Kodi was shocking to the conscience and, therefore, in violation of Kodi's rights to substantive due process under the Fourteenth Amendment. As discussed above, the jury was not instructed on the proper standard for a substantive due process claim, and therefore never determined that Corporal Ruby's conduct met that high standard. The only verdict the jury ever reached with respect to Kodi's constitutional rights was based on the Fourth Amendment's objective reasonableness standard, which all parties now agree was inapplicable to Kodi.

In addition, our determination on qualified immunity with respect to *Kodi*'s Substantive Due Process Claim is an entirely separate issue from whether Corporal Ruby acted reasonably with respect to *Ms. Gaines*. The jury decided that Corporal Ruby violated Ms. Gaines's right to be free from excessive force based on well-settled Fourth Amendment principles and awarded damages based on that verdict. Corporal Ruby was held to account for what the jury determined was an excessive use of force and nothing in our decision today implicates that decision or in any way gives license to officers to use unreasonable or excessive force. The question we have decided in this case relates to whether someone a law enforcement officer did not intend to harm has rights under the Fourteenth Amendment when they are injured by a shot intended for someone else, despite

mare's nest of complexity and confusion.'" Brief of *Amici Curiae* National Action Network and Rainbow/PUSH Coalition at 14 (quoting John C. Jeffries, Jr., *What's Wrong with Qualified Immunity?*, 62 Fla. L. Rev. 851, 852 (2010)). However, this Court is duty bound to follow the precedents of the United States Supreme Court regarding qualified immunity, including the "clearly established law" requirement. We have no discretion to do otherwise.

not being in the direct line of fire.[27]  As discussed above, the law relating to that issue (unlike the law concerning Ms. Gaines's excessive force claim) is not well settled.  To the contrary, it is largely unsettled.  Under governing precedent from the United States Supreme Court, because the law was not clearly established that shooting at Ms. Gaines where Kodi was not in the direct line of fire would violate Kodi's Fourteenth Amendment rights, Corporal Ruby is entitled to qualified immunity.

## CONCLUSION

We hold:

1.     Because the Appellate Court's judgment in *Cunningham I* reversed in full the circuit court's JNOV grant with respect to claims against Corporal Ruby, Kodi Gaines was not precluded from pursuing his Substantive Due Process Claim on remand and was not precluded from pursuing that claim in this appeal; and

2.     Corporal Ruby was entitled to qualified immunity with respect to Kodi Gaines's Substantive Due Process Claim.  Accordingly, the Appellate Court properly affirmed the circuit court's judgment on that basis.

**JUDGMENT OF THE APPELLATE COURT OF MARYLAND AFFIRMED. COSTS TO BE PAID BY PETITIONERS.**

---

[27] Justice Watts asserts that "[i]t would be an unsound premise to dispose of Kodi's §1983 Fourteenth Amendment substantive due process claims as if they were brought only on the ground that he was a bystander subject to injury during the attempted seizure of his mother."  Dissenting Op. of Watts, J. at 12.  But the harm to Kodi, in fact, occurred during the attempted seizure of Ms. Gaines.  There was no other application of force by Corporal Ruby that led to Kodi's injuries, nor has Kodi suggested otherwise.

43

Circuit Court for Baltimore County
Case No. 03-C-16-009435

Argued: December 4, 2023

IN THE SUPREME COURT

OF MARYLAND

No. 9

September Term, 2023

_____

COREY CUNNINGHAM, ON BEHALF OF
KODI GAINES, A MINOR

v.

BALTIMORE COUNTY, MARYLAND, ET
AL.

_____

Fader, C.J.
Watts
*Hotten
Booth
Biran
Gould
Eaves,

JJ.

_____

Dissenting Opinion by Watts, J.

_____

Filed: June 25, 2024

*Hotten, J., participated in the hearing of the case
and in the conference in regard to its decision as
an active judge. She retired from the Court and
was recalled to senior status prior to the adoption
and filing of the opinion.

Respectfully, I dissent. The majority opinion[1] in this case is disappointing. The opinion lets down the parties and the citizens of Maryland in that it reaches an incorrect result with respect to the application of the doctrine of qualified immunity and sets precedent that makes it next to impossible in this State for a Fourteenth Amendment substantive due process claim alleging excessive force to avoid a determination that a law enforcement officer is entitled to qualified immunity. In reaching this result, the majority opinion engages in first-level factfinding (which is improper for appellate courts to do) and appears to fault the minor child's deceased mother for his injuries. Most importantly, the Majority reaches the incorrect result by misapplying case law on qualified immunity.

I would conclude that Corporal Royce Ruby, Jr., is not entitled to qualified immunity from Kodi's substantive due process claims for three reasons.[2] First, Respondents Baltimore County and Corporal Ruby failed to preserve for appellate review the issue of whether qualified immunity applies to the claims under 42 U.S.C. § 1983 asserted by Petitioner Corey Cunningham, on behalf of his minor child, Kodi Gaines, based on Kodi's right to substantive due process under the Fourteenth Amendment.[3] Second, because the ruling of the Circuit Court for Baltimore County on remand was not based on qualified immunity, but rather the conclusion that Kodi lacked a claim under the Fourteenth

---

[1]Although the opinion that the Majority has joined is labeled "PER CURIAM[,]" I refer to it as a majority opinion.

[2]I agree with the Majority's determination that the Appellate Court erred "in holding that Kodi was precluded from pursuing his Substantive Due Process Claim on remand and in this appeal." Maj. Op. at 31.

[3]Like the Majority, I will refer to Mr. Cunningham's contentions on behalf his son Kodi as those of Kodi.

Amendment due to insufficiency of the evidence, this Court cannot affirm the circuit court's judgment based on qualified immunity. Third, in addition to the issue not being preserved or a valid ground for affirmance, Corporal Ruby is not entitled to qualified immunity from Kodi's Fourteenth Amendment substantive due process claims because he violated a clearly established right. For these reasons, I would reverse the judgment of the Appellate Court of Maryland, which affirmed the circuit court's judgment (on an entirely different ground) and remand the case to the Appellate Court with instruction for it to reverse the circuit court's judgment and remand the case to that court with instruction to award damages plus post-judgment interest for the verdict in Kodi's favor as to the claims under 42 U.S.C. § 1983.

Section 1 of the Fourteenth Amendment states:

> All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

The first section of the Fourteenth Amendment is made up of several clauses, one of which is the due process clause. It is well settled that the protections of the Fourth Amendment are applied to the States through the Due Process Clause of the Fourteenth Amendment. See Mapp v. Ohio, 367 U.S. 643, 656 (1961). Independent of incorporating the Fourth Amendment and other amendments contained in the Bill of Rights, though, the language of the Due Process Clause of the Fourteenth Amendment makes clear that a State may not deprive a citizen of life, liberty, or property without fair procedures. See Honda

<u>Motor Co. v. Oberg</u>, 512 U.S. 415 (1994). In other words, the Due Process Clause acts as a safeguard from arbitrary denial of life, liberty, or property by a State outside of the sanction of law. <u>See id.</u> The Supreme Court of the United States has described due process as "the protection of the individual against arbitrary action." <u>Ohio Bell Tel. Co. v. Public Utilities Comm'n of Ohio,</u> 301 U.S. 292 (1937).

In this case, in Counts VII and X of a Third Amended Complaint, Kodi brought claims under 42 U.S.C. § 1983 and sued Respondents for violations of the Fourteenth Amendment and other Amendments of the United States Constitution. In paragraph 88 of Count VII, Kodi alleged that Respondents violated the Fourth Amendment by illegally searching his home without "reasonable articulable facts" to believe that Ms. Gaines was inside and violated "those rights, privileges, and immunities secured by the Fourteenth, Fifth and/or Eighth Amendments to the Constitution as incorporated and applied to the states through the Fourteenth Amendment." In paragraph 90(A) of Count VII, Kodi alleged that Respondents used excessive force while attempting to seize Ms. Gaines "in violation of the Fourth, Fifth, Eighth and Fourteenth Amendments and their reasonableness standard and all other applicable standards."

In Count X, Kodi alleged both a violation of the Fourteenth Amendment based on his right under the Fourth Amendment to be free of unreasonable seizure through excessive force and a violation of the Fourteenth Amendment based on his right to "bodily integrity" and "to be free from excessive force by law enforcement." In other words, in Count X, Kodi alleged a violation of the Fourteenth Amendment separate from the allegation that excessive force was used in connection with the seizure of Ms. Gaines in violation of the

Fourth Amendment. In Paragraphs 120 and 121 of Count X , Kodi alleged:

120. At the time of the complained events, Plaintiffs Korryn Gaines and Kodi Gaines had a clearly established constitutional right under the Fourth Amendment to be secure in their person from unreasonable seizure through excessive force.

121. Plaintiffs Korryn Gaines and Kodi Gaines also had the clearly established Constitutional right under the Fourteenth Amendment to bodily integrity and to be free from excessive force by law enforcement.

In addition, in Count X, Kodi alleged that his right to be free of such conduct was clearly established, that Respondents used "conscience shocking force," and that Respondents were not entitled to qualified immunity. In Paragraphs 123, 129, and 135 Kodi averred:

123. Any reasonable police officer knew or should have known of these rights at the time of the complained of conduct as they were clearly established.

* * *

129. None of the Defendant officers took reasonable steps to protect five-year-old Plaintiff Kodi Gaines from the objectively unreasonable, malicious, grossly negligent, reckless and irresponsible and excessive force of other Defendant officers or from the reckless and irresponsible and excessive force of later responding officers despite being in a position to do so. They are each therefore liable for the injuries and damages resulting from the objectively unreasonable, reckless and irresponsible and conscience shocking force of each other officer.

* * *

135. These individual Defendants are not entitled to qualified immunity for the complained of conducts.

The issue of whether Corporal Ruby is entitled to qualified immunity is not preserved for appellate review because, at trial, Respondents did not contend in their

- 4 -

motions for judgment or their motion for judgment notwithstanding the verdict ("JNOV") that qualified immunity applies to the claims under 42 U.S.C. § 1983 based on Kodi's right to substantive due process under the Fourteenth Amendment.[4]  Under Maryland Rule 2-532(a), "[i]n a jury trial, a party may move for judgment notwithstanding the verdict only if that party made a motion for judgment at the close of all the evidence and only on the grounds advanced in support of the earlier motion."  When making the motion for judgment at the conclusion of the plaintiffs' case, without mentioning Kodi's substantive due process claims, Respondents' counsel argued that Corporal Ruby was entitled to judgment on the Fourth Amendment excessive force claims and that "[q]ualified immunity applies here[.]"  At the close of all of the evidence in the case, Respondents renewed the motion for judgment, arguing that Corporal Ruby was entitled to judgment on the Fourth Amendment excessive force claims and reiterating that qualified immunity applies.  Respondents did not seek judgment with respect to Kodi's Fourteenth Amendment claims.  In an initial memorandum and supplemental memorandum in support of the motion for JNOV, without mentioning Kodi's substantive due process claims, Respondents asserted that Corporal Ruby was entitled to qualified immunity as to the claims under 42 U.S.C. § 1983.

---

[4]The Majority does not purport to conclude that Respondents preserved for appellate review the issue of whether Corporal Ruby is entitled to qualified immunity.  Rather, after concluding that Kodi waived the issue of non-preservation, the Majority states: "[W]e decline to consider on our own initiative whether [Respondent]s waived or failed to preserve for appellate review their argument that Corporal Ruby is entitled to qualified immunity on Kodi's Substantive Due Process Claim."  Maj. Op. at 32 n.21 (citations omitted).  In essence, the Majority gives Respondents a pass for not preserving the issue, but does not give Kodi a pass for what it deems to be Kodi's failure to raise Respondents' lack of preservation.

These general assertions by Respondents were insufficient to preserve the question of whether qualified immunity applies to the claims under 42 U.S.C. § 1983 based on Kodi's right to substantive due process under the Fourteenth Amendment. Different standards apply to the right to substantive due process under the Fourteenth Amendment and the right to be free from excessive force under the Fourth Amendment, and Respondents addressed only the Fourth Amendment right in the motions for judgment and JNOV.

Significantly, after Respondents filed the initial memorandum in support of their motion for JNOV and before they filed the supplemental memorandum, Kodi filed a memorandum in opposition to the motion for JNOV, specifically contending that Kodi's right to substantive due process under the Fourteenth Amendment provided an independent basis for the claims under 42 U.S.C. § 1983. Yet, Respondents failed to address Kodi's contention in the supplemental memorandum. When granting JNOV on the ground that Corporal Ruby was entitled to qualified immunity, the circuit court did not address Kodi's substantive due process claims. It was not until after the Appellate Court remanded this case to the circuit court in <u>Cunningham v. Balt. Cnty.</u>, 246 Md. App. 630, 232 A.3d 278 (2020) ("<u>Cunningham I</u>"), that Respondents filed a Motion to Clarify Judgment and Motion for Other Appropriate Relief and a memorandum in support thereof in which Respondents argued that Corporal Ruby was entitled to qualified immunity as to any claim under 42 U.S.C. § 1983 based on substantive due process.

Respondents' failure to raise the argument that qualified immunity applied to Kodi's substantive due process claim in the motion for judgment and motion for JNOV was fatal

- 6 -

to preservation of the issue. To preserve for appellate review a contention that JNOV was warranted on a given ground, a party must have raised that ground in support of both a motion for judgment and a motion for JNOV. "[A]n argument not raised in the motion for judgment is waived in the motion for JNOV." Town of Riverdale Park v. Ashkar, 474 Md. 581, 626, 255 A.3d 140, 166 (2021) (citation omitted).

When not raised in a motion for JNOV, a contention in support of JNOV is not preserved for appellate review. In AXE Props. & Mgmt., LLC v. Merriman, 261 Md. App. 1, 52, 311 A.3d 376, 406 (2024), the Appellate Court held that the defendant "failed to preserve" an issue where "neither motion for JNOV . . . actually raised" that issue. In a motion for judgment, a renewed motion for judgment, a motion for JNOV, and a renewed motion for JNOV, the defendant made various arguments, including the assertion that the plaintiff "failed to meet his burden of proof on the issue of damages." Id. at 14-16, 20-21, 311 A.3d at 383-84, 387-88. None of the motions, however, discussed "the one recovery rule," a case in which we addressed that rule, "or the general issue that the combined compensatory award included duplicative damages." Id. at 14-16, 49-50, 311 A.3d at 383-84, 404-05 (footnote omitted). In the motions for JNOV, although the defendant "argued that the combined compensatory award must be reduced, it did not argue that the award must be modified *for these reasons.*" Id. at 50, 311 A.3d at 405 (emphasis in original). The Appellate Court concluded that the issue was unpreserved because the defendant "waited until the instant appeal to complain that the combined compensatory award ran afoul of . . . the one recovery rule[.]" Id. at 52, 311 A.3d at 406.

The same result is required here. Just as the defendant in AXE Props. & Mgmt.

failed to contend in motions for judgment and motions for JNOV that the one recovery rule had been violated, Respondents failed to argue in motions for judgment at the conclusion of the plaintiff's case and at the conclusion of all of the evidence and in the motion for JNOV that qualified immunity applies to the claims under 42 U.S.C. § 1983 based on Kodi's right to substantive due process under the Fourteenth Amendment. As in AXE Props. & Mgmt., the issue that was not raised in support of the motions for judgment and JNOV is unpreserved for appellate review. The issue of whether Corporal Ruby is entitled to qualified immunity to Kodi's Fourteenth Amendment substantive due process claim was not properly before the Appellate Court in the first or second appeal and is not properly before us now.

In addition to being unpreserved, qualified immunity is not a valid ground for affirming the circuit court's ruling on remand because that ruling was not based on qualified immunity. The circuit court's ruling on remand was based on its reasoning that Kodi lacked a valid claim under the Fourteenth Amendment because the evidence did not satisfy the shocks the conscience standard. The circuit court mentioned qualified immunity only when referring to its prior ruling on the motion for JNOV and the contentions of Kodi and the other appellants in the first appeal.

The basis of the circuit court's ruling is crucial because an appellate court may affirm the grant of JNOV only on the grounds that the trial court relied on. "Ordinarily, we may affirm the trial court only on the grounds upon which the trial court relied in granting summary judgment." Gambrill v. Bd. of Educ. of Dorchester Cnty., 481 Md. 274, 297, 281 A.3d 876, 889 (2022) (cleaned up). There is no valid reason not to apply the same

principle to affirming the grant of JNOV, especially given that there does not appear to be any case in which we have affirmed a JNOV ruling on a ground different than the one that the trial court relied on. Just as we cannot affirm the grant of JNOV based on an unpreserved issue, we should not affirm the grant of JNOV on an issue that the trial court did not rely on.

One reason for not affirming the grant of JNOV on grounds other than those relied by the trial court is that doing so would sandbag parties, as this case demonstrates. On remand, even though Respondents and the circuit court had never addressed qualified immunity in the context of the substantive due process claim, Kodi was forced to deal with Respondents' contention that Corporal Ruby was entitled to qualified immunity as to any claim under 42 U.S.C. § 1983 based on substantive due process when the argument was first raised in the Respondents' memorandum in support of the Motion to Clarify Judgment and Motion for Other Appropriate Relief. It would be improper and inequitable to reward Respondents for effectively coming up with a new ground for affirming the grant of JNOV that they had not previously raised and that the circuit court had not relied on when granting JNOV.

Putting aside that the issue of qualified immunity as to Kodi's substantive due process claims is unpreserved and not a valid ground for affirmance, it can readily be seen that Corporal Ruby is not entitled to qualified immunity, *i.e.*, the doctrine does not apply here. The Supreme Court has held that the doctrine of qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law."

Carroll v. Carman, 574 U.S. 13, 17 (2014) (per curiam) (cleaned up) . "[O]fficers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." District of Columbia v. Wesby, 583 U.S. 48, 62-63 (2018) (cleaned up). "'Clearly established' means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." Id. at 63 (cleaned up). Stated otherwise, "existing law must have placed the constitutionality of the officer's conduct beyond debate." Id. (cleaned up). The rule must be so well established "that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Id. (cleaned up). The United States Supreme Court has "repeatedly stressed that courts must not define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the circumstances that he or she faced." District of Columbia v. Wesby, 583 U.S. 48, 63-64 (2018) (cleaned up).

Caselaw makes clear that the way to proceed in determining whether an officer is entitled to qualified immunity is to first determine whether there has been a constitutional violation and what the nature of that violation is—only then can a court determine whether the officer violated a right that is clearly established. See id. at 62-63. This makes sense because it would not be necessary to reach the issue of qualified immunity if there has been no constitutional violation in the first place. In other words, an officer could not have violated a clearly established constitutional right if there has been no constitutional violation in the first place. The nature of the violation found informs the analysis as to

whether an officer has violated a right that was clearly established. See id. at 64.

In Graham v. Connor, 490 U.S. 386, 388 (1989), the Supreme Court of the United States held that claims that law enforcement officials used excessive force during an arrest, investigatory stop, or other "seizure" of a citizen "are properly analyzed under the Fourth Amendment's 'objective reasonableness' standard, rather than under a substantive due process standard." In Cnty. of Sacramento v. Lewis, 523 U.S. 833, 843 (1998), the Supreme Court explained that if a constitutional claim is covered by a more specific constitutional provision the claim must be analyzed under the standard for that provision, not under the substantive due process standard. In other words, where a claim is not covered by a more specific standard, it would be handled under the substantive due process standard. See id. Police misconduct violates the substantive due process standard where it shocks the conscience or outrages a sense of decency. See id. at 846. In Lewis, id. at 836, the Supreme Court held that "a purpose to cause harm unrelated to the legitimate object of arrest will satisfy the element of arbitrary conduct shocking to the conscience, necessary for a due process violation." So, while the "shocking to the conscience" standard is a higher standard for establishing liability than the "objective reasonableness" standard, if established, it points toward the absence of qualified immunity because the conduct is so arbitrary and so shocking that the rule against it would be clearly established, even in the absence of identifiable case law on the point.

Kodi pled §1983 claims alleging not just that he was injured as a result of excessive force used during the seizure of Ms. Gaines but also that he had a right under the Fourteenth Amendment to be free from excessive force, *i.e.*, conduct against him that was arbitrary

and shocking to the conscience.[5]  It would be an unsound premise to dispose of Kodi's

§1983 Fourteenth Amendment substantive due process claims as if they were brought only

on the ground that he was a bystander subject to injury during the attempted seizure of his

mother.[6]

That the case is unusual does not make the violation of a clearly established right

any less identifiable.  It would have been clear to any reasonable officer that, in these

circumstances, taking a head shot at an adult with a child behind a wall (where the child

could not be seen) would have violated the child's clearly established right to be free of

arbitrary and unlawful police conduct.  Indeed, under these circumstances, that right was

clearly established—*i.e.*, any reasonable officer would have known that Corporal Ruby's

conduct violated the right.

---

[5]The Majority states: "[T]he harm to Kodi, in fact, occurred during the attempted seizure of Ms. Gaines.  There was no other application of force by Corporal Ruby that led to Kodi's injuries, nor has Kodi suggested otherwise." Maj. Op. at 43 n.27.  It goes without saying that the same conduct may violate multiple constitutional provisions, just as the same conduct may violate multiple criminal statutes (although the sentences may merge).  Here, Kodi has alleged that the excessive force used by Corporal Ruby constituted an independent violation of the Fourth Amendment, the Fourteenth Amendment, and other amendments.

[6]In Chavez v. Martinez, 538 U.S. 760, 773 n.5 (2003), the Supreme Court of the United States explained: "*Graham* foreclosed the use of substantive due process analysis in claims involving the use of excessive force in effecting an arrest and held that such claims are governed *solely* by the Fourth Amendment's prohibitions against 'unreasonable' seizures, because the Fourth Amendment provided the explicit source of constitutional protection against such conduct." (Citing Graham, 490 U.S. at 394-95) (emphasis in original).  In paragraph 121 of the complaint, Kodi alleges that he and his mother had "the clearly established Constitutional right under the Fourteenth Amendment to bodily integrity and to be free from excessive force by law enforcement."  In this paragraph, unlike in paragraph 120 of the complaint, Kodi's Fourteenth Amendment claim is not limited to excessive force used in an unreasonable seizure.

The tragic circumstances of this case make inescapably clear that Corporal Ruby blindly fired his gun into a room that, as he knew, contained both Korryn Gaines and Kodi, her five-year-old child, and that he could not see where Kodi was. For all Corporal Ruby knew, Kodi could have been in Ms. Gaines's arms and directly in his line of fire. At trial, Corporal Ruby acknowledged that, when he fired his first shot, he knew that Kodi was in the kitchen behind drywall, he knew that drywall would not stop bullets from his gun, and he knew that, if he fired his gun, it was possible that he would shoot Kodi. And, that is exactly what happened—Corporal Ruby fatally shot Ms. Gaines, shot Kodi in the face and arm, and caused him to suffer serious physical injuries in addition to the traumatic loss of his mother.

The verdicts and the testimony of Respondents' own expert establish that the jury did not believe Corporal Ruby's self-serving testimony that the reason why he fired his first shot was that he saw Ms. Gaines raise her gun into a firing position and that he became concerned that she had gained a tactical advantage, in that she was able to shoot the officers outside the front door. Other witnesses—including Charles Key, Respondents' expert in use of force and other fields—indicated that, had Ms. Gaines been able to shoot the officers outside the front door, then she would have been pointing her gun at the side of the front door with hinges, and Corporal Ruby would have been able to see her hands and other parts of her body. Yet, according to Corporal Ruby, he could see the barrel of Ms. Gaines's gun and the braids in her hair.

That Corporal Ruby could see Ms. Gaines's braids is not a fact that has been found by the trier of fact, *i.e.*, the jury. It was simply Corporal Ruby's self-serving testimony.

Taking the evidence in the light most favorable to Kodi would lead to the conclusion that Corporal Ruby saw neither Ms. Gaines's braids nor the barrel of her gun. As the Appellate Court explained in Cunningham I, 246 Md. App. at 657, 232 A.3d at 294:

> Mr. Key[] testified that, if [Ms. Gaines] had been pointing the gun at the hinge side of the door, her hands and another part of her body would have been exposed. Accordingly, based on Corporal Ruby's testimony, that meant that Ms. Gaines could not have been pointing the gun at the hinge side of the door, and therefore, no one was subject to an imminent threat of death or serious bodily injury when the shot was taken.[7]

Yet, the Majority finds as a fact that "there is no evidence that Corporal Ruby intended to harm Kodi or that he knew that Kodi would be harmed[.]" Maj. Op. at 41. The Majority's finding is inconsistent with the testimony of multiple witnesses and with Corporal Ruby's own testimony that he knew that, if he fired his gun, it was possible that he would shoot Kodi. Taking the evidence in the light most favorable to Kodi would result in a conclusion that Corporal Ruby fired a M6 rifle through a kitchen wall when there was no imminent

---

[7]In addition, the Appellate Court pointed out that, at trial, in closing argument, Petitioners' counsel argued:

> Corporal Ruby testified that he saw only the ends of Ms. Gaines' hair braids and the barrel of the muzzle of the gun protruding from the kitchen, but several witnesses, including Corporal Ruby's expert, Mr. Key, and a fellow officer, Officer Callahan, testified that, if Ms. Gaines had been pointing her weapon at the door, her hands, arms, and "potentially a slight shoulder," would have to be exposed outside the kitchen wall. Additionally, the evidence showed that the first fatal shot entered Ms. Gaines' back on the left side, which Dr. Powers said was consistent with Ms. Gaines being behind the wall and not pointing the weapon toward the hinge side of the door.

Cunningham I, 246 Md. App. at 693, 232 A.3d at 316.

- 14 -

threat and he knew that five-year-old Kodi was in the kitchen but he did not know where.[8]

By answering "No" to the question on the verdict sheet of whether the first shot that Corporal Ruby fired was objectively reasonable, the jury demonstrated that it did not believe his version of events. It is evident that the jury instead credited Ms. Gaines's cousin's testimony that, right after the shootings, Corporal Ruby told him that he fired his first shot because he was "hot" and "frustrated."[9]

Reasoning that Corporal Ruby is entitled to qualified immunity leads to the perverse result that the federal constitution protected Kodi less than it did Ms. Gaines simply because she was the suspect, and he was an innocent bystander. The jury found that Respondents violated the rights of both Ms. Gaines and Kodi under 42 U.S.C. § 1983. Given that Respondents and Ms. Gaines's estate reached a settlement before the hearing in the circuit court on remand, no court has conclusively determined the basis of the verdict in Ms. Gaines's estate's favor as to the claim under 42 U.S.C. § 1983. Kodi has acknowledged that the Fourth Amendment cannot properly be a basis for the verdict in his

---

[8]Perplexingly, the Majority states that, "had the jury believed that Corporal Ruby was aiming blindly when he fired, it is difficult to imagine that the jury would not have awarded punitive damages." Maj. Op. at 41 n.25. The jury awarded damages to Kodi as follows: $23,542.29 for past medical expenses and $32,850,000.00 in noneconomic damages. Enough said.

[9]The Majority's observations that "Ms. Gaines's boyfriend attempted to convince her to allow Kodi to leave the apartment during the standoff, but Ms. Gaines did not respond, and instead instructed Kodi to stay close to her, which he did[,]" and "it is undisputed that Ms. Gaines, armed with a shotgun, declined an opportunity to let Kodi exit the standoff" add no value to the analysis. Maj. Op. at 6-7, 41 (cleaned up). These statements appear intended to give the impression that, because Ms. Gaines was a mother with mental health issues who did not respond to requests to send her child to safety, this somehow made Corporal Ruby's conduct in shooting her through a wall and injuring her child more reasonable or less shocking.

favor as to the claim under 42 U.S.C. § 1983 because he was a bystander and thus, unlike Ms. Gaines, was not seized by Corporal Ruby. It would strain logic, basic notions of fairness, and our veneration of the liberties safeguarded by the federal constitution to reason that, although the Fourth Amendment protected Ms. Gaines as a suspect, the Fourteenth Amendment did not protect Kodi either as a completely innocent bystander to a seizure or as a five-year-old child with a separate due process right.

I would conclude that Corporal Ruby violated Kodi's Fourteenth Amendment substantive due process right and that Kodi's right not to be shot by Corporal Ruby was clearly established—*i.e.*, any reasonable officer would have known that blindly firing a gun into a room that contained a five-year-old child when he could not see the child and there was no visible imminent threat to the officer would violate the child's right to substantive due process. Even if Kodi had only pled a substantive due process claim based solely on excessive force being used in the seizure of Ms. Gaines (which, the complaint demonstrates, was not his sole substantive due process claim claim), the Fourth Circuit has repeatedly "conclude[d] that [] the due process clause provides substantive protection to [] a bystander against the infliction of personal injury by police conduct sufficiently outrageous to constitute completely arbitrary state action[.]" Rucker v. Harford Cnty., Md., 946 F.2d 278, 279 (4th Cir. 1991). In Rucker, id. at 280, one of the defendant officers repeatedly fired a gun at the tires of a vehicle in which a suspect was fleeing, and one of the bullets hit a bystander—namely, the plaintiff's son. The Fourth Circuit determined that, although the circumstances of the case did not shock the conscience, "in appropriate circumstances, substantive due process protections might extend to an 'innocent bystander'

- 16 -

such as" the plaintiff's son. Id. at 281. The Fourth Circuit observed that, in Temkin v. Frederick Cnty. Comm'rs, 945 F.2d 716 (4th Cir. 1991), it had "held in a case of first impression in this circuit" that an "innocent 'bystander' injured in [a] high speed auto chase by police may have [a] substantive due process claim[,]" though that was "not established on [the] facts of" Temkin. Rucker, 946 F.2d at 281. Rucker and Temkin clearly establish that an officer can violate an innocent bystander's right to substantive due process where, as here, the officer injures the bystander in a manner so outrageous that it is completely arbitrary and shocking to the conscience.

A reasonable officer would have realized this obvious principle even without the benefit of Rucker and Temkin. As the Fourth Circuit has observed, "[s]ome things are so obviously unlawful that they don't require detailed explanation[,] and sometimes the most obviously unlawful things happen so rarely that a case on point is itself an unusual thing." Dean for & on behalf of Harkness v. McKinney, 976 F.3d 407, 417-18 (4th Cir. 2020) (citation omitted). "Indeed, it would be remarkable if the most obviously unconstitutional conduct should be the most immune from liability only because it is so flagrantly unlawful that few dare its attempt." Id. at 418 (citation omitted). Respondents should not be absolved where Corporal Ruby violated the federal constitution by firing a gun through a wall into a room with a kindergarten-age child in it simply because this is apparently the first case in which such shocking conduct has come up.

For the above reasons, respectfully, I dissent.

- 17 -

Circuit Court for Baltimore County
Case No. 03-C-16-009435
Argued: December 4, 2023

IN THE SUPREME COURT

OF MARYLAND

No. 9

September Term, 2023

_____

COREY CUNNINGHAM, ON BEHALF
OF KODI GAINES, A MINOR

v.

BALTIMORE COUNTY, MARYLAND,
ET AL.

_____

Fader, C.J.,
Watts,
Hotten,*
Booth,
Biran,
Gould,
Eaves,

JJ.

_____

Concurring and Dissenting Opinion by
Hotten, J.

_____

Filed: June 25, 2024

*Hotten, J., now a Senior Justice, participated in the hearing and conference of this case while an active member of this Court. Prior to the filing of the opinion, she was recalled pursuant to Maryland Constitution, Article IV.

I concur in part and dissent in part to the *per curiam*. The facts surrounding the killing of Ms. Korryn Gaines ("Ms. Gaines") and the shooting of her minor son must not be abstracted or diminished. In 2016, Kodi Gaines ("Kodi"),[1] then only five years old, suffered an unimaginable tragedy: witnessing first-hand the violent death of his mother at the hands of the police. Equally tragic, young Kodi's trauma exponentially expanded when the bullet which fatally wounded his mother continued its path and struck his face. This case is a catastrophic example of poor decision-making and the overzealous exercise of state-sanctioned force.

I concur with the Majority that the Appellate Court of Maryland erred in concluding that Kodi waived his Fourteenth Amendment Substantive Due Process claim. Op. at 28–31. The effect of *Cunningham v. Baltimore County* ("*Cunningham I*"), 246 Md. App. 630, 232 A.3d 278 (2020), was to revive Kodi's Fourteenth Amendment claim, which was then addressed substantively for the first time on remand. Respondents' argument that Kodi's Substantive Due Process claim was precluded by the law of the case doctrine is unfounded. As the Majority recognizes, because Kodi's Fourteenth Amendment claim was only substantively dealt with on remand, the question Kodi brought before the Appellate Court in the second appeal is not the same as what was raised in *Cunningham I*.[2] Op. 31.

---

[1] Petitioner, Corey Cunningham, filed suit on behalf of Kodi, his minor son. Like the Majority, I will refer to Petitioner as "Kodi."

[2] In my view, Respondents waived their claim for qualified immunity related to Kodi's Substantive Due Process claim. Respondents and the circuit court erroneously

(continued . . .)

(. . . continued)

However, I dissent to the Majority's decision on the merits of the Respondents' qualified immunity claim. In my view, Respondents are not entitled to qualified immunity for the actions of Corporal Ruby ("Cpl. Ruby"). As made clear by the facts, the shooting of Ms. Gaines and the injury to Kodi were unnecessary, avoidable, and legally unjustifiable. At best, this decision joins an ever-increasing line of cases in which few, if any, abusive exercises of state power are deemed violative of a person's Substantive Due Process rights. At worst, this case serves to justify future shootings by police, taken in frustration and in disregard to the risk posed to known bystanders.

*The Facts in the Light Most Favorable to Kodi*

As recognized by the Majority, Op. 32–33, the first step of the qualified immunity analysis is to "determine whether the facts, taken in the light most favorable to the non-movant, establish that the officer violated a constitutional right." *Yates v. Terry*, 817 F.3d 877, 884 (4th Cir. 2016) (citation omitted). "At the second step, courts determine whether that right was clearly established." *Id*. The Majority purports to take the facts in the light most favorable to Kodi for the *per curiam*. Op. 6 n.7. I agree this is appropriate here, but

---

believed that Kodi's adequately pled Fourteenth Amendment Substantive Due Process claim was non-existent. Despite Kodi's insistence at several stages of trial that he had a viable claim under the Fourteenth Amendment, Respondents chose to ignore that claim in their pre- and post-trial motions. As a result, Respondents failed to raise a defense of qualified immunity both in their motion for judgment and their motion for judgment notwithstanding the verdict ("JNOV"). Further, Maryland Rule 2-532 precludes the filing of JNOV on grounds not risen previously in a motion for judgment. Had Respondents' motion for JNOV argued that they were entitled to qualified immunity of Kodi's Substantive Due Process claim, Respondents' failure to raise such a defense earlier would have precluded judgment on those grounds. Given this, I would hold that Respondents' failure to raise the defense of qualified immunity relative to Kodi's Substantive Due Process claim constitutes waiver on their part.

2

disagree with its execution.  In their recitation of the facts, the Majority accepts assertions which are more favorable to Cpl. Ruby, thereby justifying the outcome of the *per curiam*. I will present the facts in the light *most* favorable to Kodi.

On August 1, 2016, officers from the Baltimore County Police Department went to the apartment of Ms. Gaines to serve her a bench warrant for failing to appear for a *misdemeanor* trial.[3]  *Cunningham I*, 246 Md. App. at 643, 232 A.3d at 286.  When police forcibly entered the apartment with their guns drawn, they encountered Ms. Gaines holding a shotgun.  *Id.* at 644–45, 232 A.3d at 287.  Ms. Gaines was not pointing the firearm at officers,[4] instead holding it in what the officers called a "low ready[]" position.[5]  *Id.* at 645, 232 A.3d at 287.  The officers retreated outside, holding the door closed to prevent anyone from leaving the apartment.  *Id.*, 232 A.3d at 287.  Ms. Gaines expressed that she "just wanted [the police] to leave," that she believed the warrant was fraudulent, and that the police were there to harm her family.  *Id.*, 232 A.3d at 287–88.  The police ordered Ms.

---

[3] The record did not appear to reflect Ms. Gaines' alleged crimes, but court records reveal that Ms. Gaines was charged with disorderly conduct, littering, failing to obey a lawful order, resisting arrest, and driving without car insurance.  *State of Maryland v. Korryn Shandawn Gaines*, Complaint Number 160701716; *State of Maryland v. Korryn Shandawn Gaines*, Citation Number 00000004R0FKS.

[4] An officer testified that Ms. Gaines was pointing the firearm at him, *Cunningham I*, 246 Md. App. at 645, 232 A.3d at 287, however, I resolve this inconsistency in the light most favorable to Kodi.

[5] "In its simplest form, low ready means your gun is in your hands, your finger is off the trigger, and the muzzle of your gun is pointing below the target."  Kevin Creighton, *Working from Low Ready*, Ammoman School of Guns (April 20, 2021), *archived at* https://perma.cc/RA2Q-53YN (depicting an image of the "low ready" position reflecting the firearm being held in front of the wielder but pointed down).

Gaines' partner and their children to leave the apartment, to which they complied. *Id.* at 646, 232 A.3d at 288. However, when confronted with the armed officers, five-year-old Kodi fled back to his mother. *Id.*, 232 A.3d at 288.

Instead of leaving with Ms. Gaines' partner and returning later, officers called in an army of reinforcements and laid siege to the apartment. "More than *30 armed*[6] *officers* and 'counter snipers'[7] took up positions in and around the apartment building[,]" including Cpl. Ruby. *Id.* at 647–48, 232 A.3d at 288–89 (emphasis added). The officers soon learned that Ms. Gaines had a history of mental illness, but never sought the intervention of a mental health specialist or social worker. *Id.* at 647, 232 A.3d at 288. This history of mental illness, coupled with a possible lapse in her medication, *id.* at 649, 232 A.3d at 290, may explain some of her behavior. Ms. Gaines purported to "laugh[] back and forth at certain points[]" with officers, while at other times accusing officers of being "devils" and threatening to harm them. *Id.* at 648–49, 232 A.3d at 289. However, consistent with her earlier statements, Ms. Gaines asserted that she did not want to harm anyone, the implied exception being if police attempted to apprehend her or harm her family. *Id*. at 648, 232 A.3d at 289.

---

[6] The officers were equipped with "a ballistic helmet, ballistic vest, gloves, [and] front and back rifle plates[.]" *Cunningham I*, 246 Md. App. at 649, 232 A.3d at 290. This also included throat and groin protectors. This armor was sufficient to block fire from a shotgun. *Id.* at 651, 232 A.3d at 291.

[7] One struggles to comprehend the utility of "counter snipers" when there are no snipers to be countered. This decision is indicative of the type of overreactive and poor judgment which led to the shooting of Ms. Gaines and Kodi.

The siege of Ms. Gaines' apartment continued for approximately six hours. *Id.* at 649, 232 A.3d at 289. That day in August was reportedly very hot, so much so that the police turned off the air conditioning in the apartment to increase pressure on Ms. Gaines to surrender. *Id.*, 232 A.3d at 289. Cpl. Ruby later told witnesses he had been "hot" and "frustrated" prior to shooting Ms. Gaines and Kodi.[8] *Id.* at 647, 232 A.3d at 294–95. In this state, Cpl. Ruby decided he wanted to end the siege. *Id.*, 232 A.3d at 294–95.

As the siege continued, Ms. Gaines went into her kitchen with Kodi. *Id.* at 650, 232 A.3d at 290. Cpl. Ruby moved from his long-held position to get a better sightline into the kitchen, ordering other officers to move back from the door as he moved. *Id.* at 651, 232 A.3d at 291. During this time, Cpl. Ruby was able to relay Ms. Gaines' movements to other officers. Those officers were able to implore Ms. Gaines to lower her weapon, and Ms. Gaines was able to yell back. *Id.* at 652, 232 A.3d at 291. After moving to a new position, Cpl. Ruby claimed he could see Ms. Gaines' braids and her firearm.[9] *Id.*, 232

---

[8] Cpl. Ruby testified to having stood at the entrance to Ms. Gaines' apartment, in full tactical armor, for nearly the entire siege, taking only a "20-minute break for 'water and a pack of crackers.'" *Cunningham I*, 246 Md. App. at 650, 232 A.3d at 290 (footnote omitted). A supervisory officer on the scene testified that, after around six hours, "officer fatigue can become a concern[,]" but that he had only begun to coordinate relief for the officers when Cpl. Ruby decided to shoot Ms. Gaines. *Id.* at 650 n.11, 232 A.3d at 290 n.11.

[9] Cpl. Ruby testified that he could see the barrel of Ms. Gaines' firearm, and that she was raising it toward him just before he fired. *Cunningham I*, 246 Md. App. at 652, 232 A.3d at 291. Cpl. Ruby acknowledged that Ms. Gaines entered the kitchen while maintaining her weapon at a "low ready[]" position, but claims she began to raise it "in a 'staggered or incremented' fashion[.]" *Id.*, 232 A.3d at 291. Conveniently, Cpl. Ruby was the only officer to have seen this and he relayed his claimed observations to fellow officers. *Id.*, 232 A.3d at 291. Given that Ms. Gaines was shot in the back, *id.* at

(continued . . .)

5

A.3d at 291. Cpl. Ruby knew Kodi was in the kitchen, but not sure where. *Id.*, 232 A.3d at 291–92. Hoping to shoot Ms. Gaines in the head, but without confirming the location of either Ms. Gaines or Kodi, Cpl. Ruby shot through the drywall of the kitchen wall. *Id.* at 652–53, 232 A.3d at 291–92. The bullet struck Ms. Gaines in the upper left back before ricocheting off the refrigerator and lodging fragments of itself in Kodi's face. *Id.*, 232 A.3d at 292.

### *Qualified Immunity and Substantive Due Process*

In my view, Respondents are not entitled to qualified immunity for actions which magnified the obvious abuse of their power.[10] The doctrine of qualified immunity is not a creature of any constitutional provision or statute. *See Pierson v. Ray*, 386 U.S. 547, 555, 87 S. Ct. 1213, 1218 (1967) (deriving the doctrine from the Restatement, Second of Torts, "Harper & James, The Law of Torts[,]" and *State of Missouri ex rel., and to Use of Ward v. Fidelity & Deposit Co. of Maryland*, 179 F.2d 327 (8th Cir. 1950)). To advance it, Cpl. Ruby must assert that his actions did not violate the constitutional rights of Kodi that

---

(. . . continued)
653, 232 A.3d at 292, Cpl. Ruby's observations of Ms. Gaines were obviously false. It is unclear whether this inaccuracy was a result of Cpl. Ruby being "hot" and "frustrated" or done intentionally.

[10] The mere fact that Kodi's Substantive Due Process claim made it to trial should be dispositive. *See Pearson v. Callahan*, 555 U.S. 223, 231–32, 129 S. Ct. 808, 815 (2009) ("[Q]ualified immunity . . . is effectively lost if a case is erroneously permitted to go to trial[,] . . . [and] we repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation." (quotation marks and citations omitted)).

existed in light of the "clearly established law" at that time.[11]  *Mullenix v. Luna*, 577 U.S.

7, 11, 136 S. Ct. 305, 308 (2015).  "The doctrine of qualified immunity protects government

officials from liability for civil damages insofar as their conduct does not violate clearly

established statutory or constitutional rights of which a reasonable person would have

---

[11] The Majority recognizes that this is a two-part test consisting of (1) determining whether a constitutional right was violated, and (2) whether that right was clearly established at the time.  Op. 32–33.  *Pearson* recognized that this first prong of the qualified immunity step may also be resolved by examining "the facts that a plaintiff has *alleged*[.]" 555 U.S. at 232, 129 S. Ct. at 815–16 (emphasis added).  This is because the Supreme Court of the United States has "repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in litigation."  *Id.*, 129 S. Ct. at 815; *see also Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156 (2001) (same); *Hunter v. Bryant*, 502 U.S. 224, 227, 112 S. Ct. 534, 536 (1991) (*per curiam*) (same).  I agree with the Majority that Kodi adequately pled a violation of his Substantive Due Process rights. Op. 30 n.20.  While the Majority elects not to analyze the first prong of the qualified immunity test, Op. 33 n.22, Kodi's third amended complaint sufficiently articulated the events of the shooting through the lens of Substantive Due Process as to allow resolution of this prong in his favor.

Alternatively, examining the facts developed at trial also demonstrates that Kodi satisfied this first prong.  Under the Substantive Due Process "shocks the conscience" standard, discussed below, there are two main avenues of legal culpability: "intent to harm" and "deliberate indifference[.]"  *Dean for & on behalf of Harkness v. McKinney*, 976 F.3d 407, 414 (4th Cir. 2020); *see also Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 848–50, 118 S. Ct. 1708, 1717–18 (1998).  "[U]nder *Lewis*, the intent-to-harm culpability standard applies to officers responding to an emergency call[]" and, as the name suggests, requires an intent to harm the bystander to be conscience shocking.  *McKinney*, 976 F.3d at 415 (citations omitted).  In contrast, "liability for deliberate indifference rests upon the luxury of having time to make unhurried judgments, upon the chance for repeated reflection, largely uncomplicated by the pulls of competing obligations.  When such extended opportunities to do better are teamed with protracted failure even to care, indifference is truly shocking."  *Id.* (quotation marks and citations omitted).  Given the time Cpl. Ruby had to move, to talk with his team, for his team to talk with Ms. Gaines, and for Ms. Gaines to respond, Cpl. Ruby had time to deliberate and reconsider his actions.  *Cf. McKinney*, 976 F.3d 411–12, 419 (holding that a deputy continuing to speed for two minutes after an emergency call was rescinded fell under the deliberate indifference standard).  Knowing Kodi was in the line of fire, Cpl. Ruby fired when he did not need to with deliberate indifference to Kodi's safety and in violation of Kodi's Substantive Due Process rights.

known." *Pearson*, 555 U.S. at 231, 129 S. Ct. at 815 (quotation marks and citation omitted).

At issue before this Court is Kodi's Substantive Due Process right to be free from harm resulting from an abuse of state power. As the Majority recognizes, where a person is injured through police action, but was not the intended object of that action, they may pursue recourse under the Fourteenth Amendment's Due Process Clause.[12] Op. 3–4 (citing *Rucker v. Harford County*, 946 F.2d 278, 281 (4th Cir. 1991)). At its core, the Substantive Due Process doctrine is designed to further the promise of protecting citizens from an abusive government, and fill the "gaps" left open between the guarantees of the Bill of Rights. *See, e.g.*, *Loving v. Virginia*, 388 U.S. 1, 12, 87 S. Ct. 1817, 1824 (1967) (holding that a statute barring interracial marriage "deprive[s] . . . [one] of liberty without due process of law in violation of the Due Process Clause of the Fourteenth Amendment.").

The intent of the Substantive Due Process doctrine, is important to recognize:

> Since the time of our early explanations of due process, we have understood the core of the concept to be protection against arbitrary action: The principal and true meaning of the phrase has never been more tersely or accurately stated than by Mr. Justice Johnson: . . . As to the words from Magna [Carta], . . . after volumes spoken and written with a view to their exposition, the good sense of mankind has at last settled down to this: *that they were intended to secure the individual from the arbitrary exercise of the powers of government, unrestrained by the established principles of private right and distributive justice.*

---

[12] Section One of the Fourteenth Amendment provides in pertinent part that "[n]o State shall . . . *deprive any person of life, liberty, or property, without due process of law*; nor deny to any person within its jurisdiction the equal protection of the laws." (Emphasis added).

*Lewis*, 523 U.S. at 845, 118 S. Ct. at 1716 (quotation marks and citations omitted) (emphasis added); *see also Daniels v. Williams*, 474 U.S. 327, 331, 106 S. Ct. 662, 665 (1986) (holding that the Substantive Due Process doctrine, which, "like its forebear in the Magna Carta, . . . was intended to secure the individual from the arbitrary exercise of the powers of government[.]") (quotation marks and citations omitted)).  The Supreme Court of the United States has held "that only the most egregious official conduct . . . which shocks the conscience[]" violates Substantive Due Process. *Lewis*, 523 U.S. at 846, 118 S. Ct. at 1716–17 (citations omitted).  *Lewis* adopted language from *Betts v. Brady*, 316 U.S. 455, 62 S. Ct. 1252 (1942), which characterized a conscience shocking breach of Substantive Due Process as "a denial of fundamental fairness, shocking to the universal sense of justice[.]" *Lewis*, 523 U.S. at 850, 118 S. Ct. at 1719.

It is accepted that whether a right is "clearly established" for purposes of qualified immunity, represents a high hurdle.  *See generally Pearson*, 555 U.S. 223, 129 S. Ct. 808; *Mullenix*, 577 U.S. 7, 136 S. Ct. 305; *see also D.C. v. Wesby*, 583 U.S. 48, 63, 138 S. Ct. 577, 589 (2018) ("This demanding standard protects all but the plainly incompetent or those who knowingly violate the law." (quotation marks and citations omitted)).  However, there still exists "the rare 'obvious case,' where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." *Wesby*, 585 U.S. at 64, 138 S. Ct. at 590.  In my view, the shooting of Kodi is such an obvious case, and a violation of Kodi's Substantive Due Process right was "clearly established" at the time of the shooting.

*The shooting of Ms. Gaines and Kodi is an obvious case of abusive state action.*

The record reveals that the shooting which killed Ms. Gaines and injured her son, Kodi, was egregious. Immediately prior to the shooting, Ms. Gaines was not an imminent threat to the officers. Officers were in covered positions outside of the apartment and wearing armor designed to protect from the type of weapon Ms. Gaines carried. *See Cunningham I*, 246 Md. App. at 651, 232 A.3d at 291 ("All officers in the brick-lined hallway were armed and wearing body armor designed to stop projectiles such as shotgun rounds."). In fact, as recounted above, Ms. Gaines was not facing officers at all when she was shot and at no point raised her weapon to fire at officers. Similarly, there is nothing in the record to support that Ms. Gaines was a threat to Kodi. *See generally Id.*, 232 A.3d 278.

By the time Ms. Gaines moved to the kitchen, the record reflects that Cpl. Ruby was "hot" and "frustrated[.]" *Id*. at 657, 232 A.3d at 295. When viewing the record in the light most favorable to Kodi, it becomes apparent that Cpl. Ruby wanted to bring the approximately six-hour siege to an end, despite the lack of an immediate threat from Ms. Gaines. Fully cognizant that young Kodi was in close proximity to the line of fire, Cpl. Ruby chose to fire through a wall at Ms. Gaines, hoping to hit her in the head. What followed was foreseeable: Cpl. Ruby missed the mark and shot Ms. Gaines through the back. The bullet ripped through her body, ricocheted off the refrigerator, and struck Kodi in the face.

*Lewis* sets forth that what shocks the conscience is that which is "shocking to the universal sense of justice[.]" 523 U.S. at 850, 118 S. Ct. at 1719. In my view, the decision

10

by an officer to shoot through a wall, at a target he could not see, when he knew a child was on the other side of that wall and could be injured or killed, is patently offensive to a "universal sense of justice." This should be an obvious case, especially when considering the motivation for the shooting was not the protection of life or the enforcement of law, but instead was an officer's feeling that he was "hot" and "frustrated" by the siege he and his colleagues began.

*Kodi's Substantive Due Process Right Was Clearly Established*

In large part, the Majority is correct in their recitation of the "clearly established" standard. Op. 34–35. Indeed, the clearly established standard is usually a high one, requiring "a robust consensus" of authority, *Wesby*, 583 U.S. at 63, 138 S. Ct. at 589, placing it "beyond debate[,]" *Kisela v. Hughes*, 584 U.S. 100, 104, 138 S. Ct. 1148, 1152 (2018), that "every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741, 131 S. Ct. 2074, 2083 (2011). The Majority acknowledges "'[c]learly established' does not mean that there must be a case with precisely matching facts or that found a violation in the same specific context.'" Op. 34 (citing *Terry*, 817 F.3d 887). Following a review of several cases, most of which did not find a violation of Substantive Due Process, the Majority concluded that "it would be difficult for officers in Corporal Ruby's position to glean any guiding standards from these cases, except possibly in the most general sense." Op. 37–41. I disagree.

The question faced by Cpl. Ruby, or another officer facing a similar situation, was whether to shoot Ms. Gaines despite the known risk to Kodi. Several of the cases cited by the Majority provide "practical advice" in making that determination: collectively standing

11

for the proposition that, as a threshold for firing, an emergency situation must be present.[13]

*See, e.g.*, *Lewis*, 523 U.S. at 855, 118 S. Ct. at 1721 (no violation of Substantive Due Process where "[officer] Smith was faced with a course of lawless behavior for which the police were not to blame. They had done nothing to . . . encourage [the suspect] to race through traffic at breakneck speed forcing other drivers out of their travel lanes. [The suspect]'s outrageous behavior was practically instantaneous, and so was [officer] Smith's instinctive response."); *Rucker*, 946 F.2d at 279–82 (no violation of Substantive Due Process where officers in pursuit fired upon a fleeing suspect who had driven "wildly, weaving in and out of traffic[,] . . . southbound in the northbound lanes of I–95[,]" and at officers multiple times); *Medeiros v. O'Connell*, 150 F.3d 164, 166, 169–70 (2d Cir. 1998) (holding that a police shooting of a hostage was not violative of Substantive Due Process where the suspect was wildly shooting at police during a car chase). An example not cited by the Majority is *Ewolski v. City of Brunswick*, 287 F.3d 492, 497–99 (6th Cir. 2002), which held that a police shooting of a hostage was not violative of Substantive Due Process

_____

[13] Whether a right is "clearly established" is a separate test from whether a right was violated. *Pearson*, 555 U.S. at 232, 129 S. Ct. at 815–16. However, for cases to "clearly establish" a right, they often must have held that the right was violated, which is in line with the first prong outlined in *Pearson*. As I discuss above, determining whether one's Substantive Due Process right was violated necessitates the use of one out of two culpability standards. In their review of cases, the Majority often cites to cases which have adopted the "intent to harm" standard or its functional equivalent. As I have expressed, I do not believe that this is the appropriate standard here given the lack of an immediate threat posed by Ms. Gaines and Cpl. Ruby's time to reconsider his actions. An immediate, ongoing, or increasing threat often undergirds the precedents which have held there was no violation of Substantive Due Process. *Compare Rucker*, 946 F.2d at 279–82 (no violation where suspect was driving the wrong direction in traffic and at officers), *with McKinney*, 976 F.3d at 411–12, 419 (violation where deputy continued to speed after an emergency call was rescinded).

where police tried non-lethal interventions and the suspect responded by shooting several officers.

Admittedly, there is no case which held, under the exact factual scenario before us, there was a violation of a clearly established constitutional right. However, the guidance is clear: absent an imminent threat to life, i.e. an emergency, there is little justification for a police shooting. While this may be considered "[m]ere general guidance[,]"Op. 34, which runs counter to the guidance from the Supreme Court of the United States, at core, the relevant consideration is whether an officer, faced with a similar situation would act as Cpl. Ruby had. In my view, the law has set forth a sufficient threshold consideration for choosing whether to fire on a suspect when innocent bystanders are in the line of fire: whether there is an imminent risk.[14] Cpl. Ruby chose to ignore this threshold exigency requirement when he was admittedly "hot" and "frustrated."

*Conclusion*

In my view, this shooting was an abusive act of misconduct, fueled by personal frustration, which violated Kodi's constitutional rights under the Fourteenth Amendment. Respondents are not owed qualified immunity for the actions of Cpl. Ruby. In my view, law enforcement officers do not have carte blanche to end the life of a suspect and injure

---

[14] The Supreme Court of the United States has also outlined a more forgiving "fair warning" standard. *See United States v. Lanier*, 520 U.S. 259, 266, 270, 117 S. Ct. 1219, 1225, 1227 (1997) (equating the "clearly established" standard with the "fair warning" test used to gauge the vagueness of criminal statutes); *Hope v. Pelzer*, 536 U.S. 730, 741, 122 S. Ct. 2508, 2516 (2002) (utilizing the "fair warning" standard). Thus far, the "fair warning" standard is still applicable. Here, Cpl. Ruby undoubtedly had "fair warning" that, absent an emergency, his shot would violate Kodi's rights if he were to be injured.

13

innocent bystanders when they feel frustrated. This is the type of bad faith abuse of state power which the Substantive Due Process doctrine was designed to protect. I am concerned that this case will join an ever-lengthening body of law which consistently holds that no rights are clearly established under the Substantive Due Process doctrine. Justice is more than a concept. It must be applied equally if it is to achieve any meaning of legitimacy. To deprive Kodi of a meaningful opportunity to pursue his Substantive Due Process claim will place him on the precipice of yet another injustice. Kodi suffered an immeasurable harm[15] from the excessive actions of law enforcement. To protect both him and the public from similar abuse, Kodi's harm should not go unrecognized.

---

[15] It has been suggested that Kodi was made sufficiently whole through a monetary judgment on his battery claim. This contention misses the mark. At issue is whether the exercise of violence by the state against an innocent minor bystander was justified under the law. The power of a verdict, laid down by one's peers, recognizing the extent of the pain and the significance of the claim, cannot be undersold. Justice is not always equitable when equated with monetary compensation.